**BRIDGES et al. v. UNITED STATES.**

No. 12597.

United States Court of Appeals
Ninth Circuit.

Sept. 6, 1952.

As Amended on Denial of Rehearing
Nov. 18, 1952.

Second Petition for Rehearing Denied
Dec. 29, 1952.

See also, 93 F.Supp. 989.

Gladstein, Andersen & Leonard, Norman Leonard, Vincent W. Hallinan, James Martin MacInnis, San Francisco, Cal., for appellants.

Chauncey Tramutolo, U. S. Atty., Robert B. McMillan, Asst. U. S. Atty., San Francisco, Cal. (James M. McInerney, Asst. Atty. Gen., Beatrice Rosenberg, Carl H. Imlay, John R. Wilkins, Attys., Dept. of Justice, Washington, D. C., John P. Boyd, Sp. Asst. Atty. Gen., of counsel), for appellee.

Before STEPHENS, BONE, and POPE, Circuit Judges.

STEPHENS, Circuit Judge.

On the 25th day of May, 1949, a single indictment was returned by a United States Grand Jury charging Harry Renton Bridges, Henry Schmidt, and J. R. Robertson with the crime of conspiracy to fraudulently secure Bridges' naturalization, Count I; 18 U.S.C.1946 ed. § 88, now 18 U.S.C. 1948 Rev. § 371; charging Bridges with the crime of knowingly making a false statement under oath relating to his naturalization proceedings, Count II; 8 U.S.C.1946 ed. § 746(a) (1), now 18 U.S.C.1948 Rev. § 1015(a); charging Schmidt and Robertson each with the crime of fraudulently aiding and abetting an alien (Bridges) to procure naturalization, Count III; 8 U.S.C.1946 ed. § 746(a) (5), now 18 U.S.C.1948 Rev. § 1425. All of the charges contained in the indictment were submitted together to a jury which returned verdicts of guilty against each defendant as charged in each count; judgment and sentence followed;

and each defendant appeals on numerous grounds as to each judgment.[1]

### Count I

Count I is laid under Title 18 U.S.C. 1946 ed. § 88, (now 18 U.S.C.1948 Rev. § 371) in which Bridges, Schmidt and Robertson were charged with having conspired together to secure the naturalization of Bridges, an alien, by fraudulently representing that he had never belonged to the Communist Party of the United States. The applicable statute is as follows:

§ 88. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

The texts of the Count, and the alleged overt acts, are set out in the margin.[2]

1. Bridges was sentenced to:
 two years imprisonment on Count I of the indictment and five years on Count II of the indictment, commencing and running concurrently.
 Schmidt was sentenced to:
 two years imprisonment on Count I of the indictment and two years on Count III of the indictment, commencing and running concurrently.
 Robertson was sentenced to:
 two years imprisonment on Count I of the indictment and two years on Count III of the indictment, commencing and running concurrently.

2. Count I: "The Grand Jury charges: That Harry Renton Bridges, Henry Schmidt, and J. R. Robertson (hereinafter called 'said defendants') on or about the 23rd day of June, 1945, and continuing thereafter until on or about October 1, 1945, and for some time prior thereto, the exact time being to the Grand Jury unknown, at the City and County of San Francisco, State of California, within said Division and District, did conspire with each other, and with divers other persons to the Grand Jury unknown, to defraud the United States by impairing, obstructing and defeating the proper administration of its naturalization laws, in the manner following, to wit: By having said defendant Harry Renton Bridges fraudulently petition for and obtain naturalization in a naturalization proceeding in the Superior Court of the State of California, in and for the City and County of San Francisco, by falsely and fraudulently stating and representing to the said Court in said proceeding numbered 28152 in the records of said Superior Court, that he, said defendant Harry Renton Bridges, had never belonged to the Communist Party in the United States; that said statement and representation so agreed to be made, and made, as aforesaid, as said defendants, and each of them at all times herein mentioned

well knew, were false and fraudulent in this, that said defendant Harry Renton Bridges had in truth and in fact belonged to and been a member of the Communist Party in the United States from the year 1933 up to and including said 17th day of September, 1945; that said statement and representation were material to said naturalization proceeding.

"That in pursuance of such conspiracy, and during the existence thereof, and in furtherance, and to effect the objects thereof, said defendants, respectively, did and performed the following overt acts:

"1. On the 23rd day of June, 1945, defendant Harry Renton Bridges filed at the office of the Immigration and Naturalization Service, in the City of San Francisco, State of California, an application for a Certificate of Arrival and preliminary form for petition for naturalization.

"2. On or about the 8th day of August, 1945, said defendant Harry Renton Bridges appeared before Lloyd H. Garner, a Naturalization Examiner of the United States, at San Francisco, State of California, in the office of the County Clerk in and for the City and County of San Francisco, and gave testimony in the matter of the application of said defendant Harry Renton Bridges for naturalization.

"3. On or about the 8th day of August, 1945, said defendants Henry Schmidt and J. R. Robertson, and each of them, at the office of the County Clerk in and for the City and County of San Francisco, State of California, signed as witnesses a petition for naturalization in the case of defendant Harry Renton Bridges.

"4. On on about the 17th day of September 1945, said defendants Harry Renton Bridges, Henry Schmidt, and J. R. Robertson, and each of them, appeared in the Superior Court of the

## Count II

Count II is laid under Section 346 of the Nationality Act of 1940, c. 876, 54 Stat. 1137, 1163, Title 8 U.S.C.1946 ed. § 746(a) (1), (now 18 U.S.C.1948 Rev. § 1015(a), in which Bridges, alone, is charged with having fraudulently made a false statement under oath [3] in his naturalization proceedings in the Superior Court of California, as follows:

Question by the Court to Mr. Bridges: "Do you now, or have you ever, belonged to the Communist Party of the United States?"

Answer by Mr. Bridges: "I have not; I do not."

The applicable statute is as follows:

8 U.S.C.1946 ed. § 746(a). "It is hereby made a felony for any alien or other person, whether an applicant for naturalization or citizenship, or otherwise, and whether an employee of the Government of the United States or not—

"(1) Knowingly to make a false statement under oath, either orally or in writing, in any case, proceeding, or matter relating to, or under, or by virtue of any law of the United States relating to naturalization or citizenship."

The text of the Count II is set out in the margin.[4]

## Count III

Count III is laid under Section 346 of the Nationality Act of 1940, c. 876, 54 Stat. 1137, 1163, Title 8 U.S.C.1946 ed. § 746(a) (5). In this Count Schmidt and Robertson are accused of knowingly encouraging, aiding, advising, and assisting Bridges to secure his naturalization through fraud. The applicable statute is as follows:

8 U.S.C.1946 ed. § 746(a). "It is hereby made a felony for any alien or other person, whether an applicant for

State of California, in and for the City and County of San Francisco, and gave testimony in support of the petition of defendant Harry Renton Bridges for naturalization."

3. In reading the authorities which follow, it is necessary to keep in mind that Bridges was not charged with the crime of perjury but was charged with the separate offense of having fraudulently made a false statement under oath in his naturalizatipn proceedings.

4. Count II: "The Grand Jury further charges: That on the 17th day of September, 1945, at the City and County of San Francisco, State of California, in the Superior Court of the State of California, in and for the City and County of San Francisco, Honorable Thomas M. Foley, Superior Judge, presiding, there came on for hearing a naturalization proceeding, numbered 28152 in the records of said Superior Court, on the petition of defendant Harry Renton Bridges for naturalization under the Nationality Act of October 14, 1940; that defendant Harry Renton Bridges then and there was called and produced as a witness in said proceeding then on for hearing, and took an oath before said Court that he, the said defendant, would testify truly in said proceeding, and said Court then and there had competent authority to administer said oath, and did administer it;

that defendant Harry Renton Bridges did then and there wilfully and knowingly make a false statement under oath in certain matters which were material to the issues of said proceeding then and there being heard, giving the following answers to questions asked, to wit:

" 'Q. Do you now, or have you ever, belonged to the Communist Party in the United States?

" 'A. I have not; I do not.'

That said answers so stated and testified to by defendant Harry Renton Bridges were, and each of them was, as said defendant then and there knew, wilfully false and contrary to his said oath, and said defendant did not then and there believe said answers, or any of them, to be true, and the said answers were, and each of them was, then and there believed and known by him to be false.

"That in truth and in fact said defendant at the time of so testifying belonged to and was a member of the Communist Party in the United States, and had belonged to and been a member of said Communist Party in the United States from 1933 up to and including said 17th day of September, 1945.

"That said statement and testimony of said defendant, and said answers given by him as aforesaid, were upon a material matter, and were material in and to the issues of said proceeding."

naturalization or citizenship, or otherwise, and whether an employee of the Government of the United States or not—

\* \* \* \* ,\* \*

"(5). To encourage, aid, advise, or assist any person not entitled thereto to obtain, accept, or receive any certificate of arrival, declaration of intention, certificate of naturalization, or certificate of citizenship, or other documentary evidence of naturalization or of citizenship—

"a. Knowing the same to have been procured by fraud; \* \* \*."

The text of the Count is set out in the margin.[5]

### The Statute of Limitations

The acts which are the bases of the charges were performed within the period intervening between June 23 to October 1, 1945, and since the indictment was returned on May 25, 1949, the three year period provided by the general statute of limitations,[6] within which prosecutions could legally be instituted, had expired and the judgments must be reversed and the indictment dismissed if the prosecution is limited to such period.

The government thinks the prosecution is not so limited because the Congress, aware of the difficulty of prosecuting frauds committed against the government during wartime, enacted the so-called Wartime Suspension Act[7] which provided that the three-year period would not begin to run until cessation of war hostilities had been officially proclaimed.

Appellants are of the opinion that not one of the alleged offenses is a fraud against the government cognizable by the Suspension Act, and therefore institution of the

5. Count III: "The Grand Jury further charges: That said defendants, Henry Schmidt and J. R. Robertson, on or about the 17th day of September, 1945, at the City and County of San Francisco, State of California, within said Division and District, did wilfully and knowingly encourage, aid, advise and assist a person, to wit, Harry Renton Bridges, not then and there entitled thereto, to obtain, accept and receive a Certificate of Naturalization, which was to be procured, and was procured by fraud, as said defendants, and each of them, at all times herein mentioned well knew, said fraud consisting of false and fraudulent statements and representations made in a naturalization proceeding before the Superior Court of the State of California in and for the City and County of San Francisco, numbered 28152 in the records of said Superior Court, and said Harry Renton Bridges did not belong to the Communist Party in the United States and had never belonged to the Communist Party in the United States, whereas in truth and in fact said Harry Renton Bridges then and there, as said defendants Henry Schmidt and J. R. Robertson, and each of them, then and there well knew, belonged to and was a member of the Communist Party in the United States, and had belonged to and been a member of said Communist Party in the United States from 1933 up to and including said 17th day of September, 1945."

6. Act of June 25, 1948, c. 645, 62 Stat. 828, Title 18 U.S.C. § 3282: OFFENSES NOT CAPITAL. "Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within three years next after such offense shall have been committed."

7. Act of June 25, 1948, c. 645, 62 Stat. 828, Title 18 U.S.C. § 3287: WARTIME SUSPENSION OF LIMITATIONS: "When the United States is at war the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war, or with any disposition of termination inventory by any war contractor or Government agency, shall be suspended until three years after the termination of hostilities as proclaimed by the President or by a concurrent resolution of Congress. \* \* \*"

prosecution for these offenses was not extended by it.

The first count of the indictment is under the substantive offense of conspiracy, and the second and third counts are offenses defined in the statute commonly referred to as the Nationality Act of 1940. The government is of the opinion that the statute of limitations of five years provided in the Nationality Act of 1940 [8] applies to Counts II and III independently of the general statute of limitations, and the Suspension Act, while appellants claim that it does not apply and that the general statute of limitations of three years is the applicable limitation, we shall go immediately to the consideration of the latter problem.

### The Saving Clause in the Repeal of Offenses Charged in Counts II and III

On June 25, 1948, Title 18 of the United States Code, entitled "Crimes and Criminal Procedure" was enacted and became effective law as of September 1, 1948, Act of June 25, 1948, 62 Stat. 683. By the adoption of the code the criminal laws of the nation, so far as practical, were brought together in orderly manner through the method of simultaneous repeal and reenactment by Congress. By the new code the section of the Nationality Act of 1940, Title 8 U.S.C.A. § 746(a)(1), under which Count II of the indictment in suit was laid, was brought into the new code as § 1015(a) of Title 18, and in the same manner the section of the Nationality Act, Title 8 U.S. C.A. § 746(a)(5), under which Count III of the indictment in suit was laid, was brought into the new code as § 1425 of Title 18, with some change in phraseology not important in this case.

However, the June 25, 1948, Act provided by § 21 thereof the following:

"The sections or parts thereof of the Revised Statutes or Statutes at Large enumerated in the following schedule are hereby repealed. Any *rights* or *li-*

*abilities* now existing under such sections or parts thereof shall not be affected by this repeal." (Emphasis ours.]

The sections of the laws under which Counts II and III were laid are enumerated in the schedule. It is clear, therefore, that the laws under which the charges in this case were laid continued effectively until the then existing rights or liabilities were extinguished by the running of a statute of limitations or otherwise.

The Nationality Act contained a section which provided for a five-year limitation, Title 8 U.S.C.A. § 746(g), upon the institution of criminal proceedings for offenses defined therein. That section was included in the schedule of repealed sections but it was not carried over into the new code; instead an omnibus section of the new code included the limitation applicable to the offenses in suit. The section reads:

"§ 3282. Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital unless the indictment is found or the information is instituted within three years next after such offense shall have been committed." Title 18 U.S.C.A. § 3282, Act of June 25, 1948, c. 645, 62 Stat. 828.

It is apparent that if the five-year limitation in the old Nationality Act, Title 8 U.S.C.A. § 746(g), remained effective through the provision in the repealing and reenacting Act, both Counts II and III were laid in time under it. It remained effective if the reservation of "rights or liabilities" preserved the limitation, as well as the substantive offenses then existing, as to offenses which had been committed prior to the effective date of the new code. The trial court held that the limitation was preserved and the government supports the holding.

Keeping in mind the remedial purpose of the revisors, and Congress, we think the

---

8. Nationality Act of 1940, Section 346(g), c. 876, 54 Stat. 1137, 1167, Title 8 U.S.C. 1946 ed. § 746(g): STATUTE OF LIMITATIONS.

"No person shall be prosecuted, tried, or punished for any crime arising under the provisions of this chapter unless the indictment is found or the information is filed within five years next after the commission of such crime."

Saving Clause cannot be given the broad effect claimed for it by the government. What was done, as we have said, was the transfer of laws relating to crime into one code of laws. The offenses charged in Counts II and III were so transferred and in order that no doubt should arise as to their effective continuity from their original setting to the new one the Saving Clause was added. The revisors saw no reason for the period of five years for instituting prosecution for violation of the offenses defined in the Nationality Act and shorter periods for certain other offenses. Therefore, they did not move the five-year limitation section into the new code and did not continue it as law, as they did the sections defining the offenses under which Counts II and III were laid. Instead, they fixed the limitation period at three years through the operation of the omnibus section. Of course, statutes of limitations are at all times subject to change, though change never revives a right against which a limitation has entirely run.

The legislation was skillfully drawn to prevent the nullification of prosecutions already begun by providing for continuity of the offenses through the revision and to prevent an effective amnesty as to violations more than three and less than five years old by postponing the effective date long enough for the government to act under the old five-year limitation.

 We hold that the statute of limitations of five years for violations of offenses under the Nationality Act yielded to the three-year provision as of the effective date of the revision.

Appellants suggest in their brief that the revision, including the Saving Clause, was intended to apply only to prosecutions already instituted. The tenor of what we have already written shows that we disagree and the reasons for disagreement.

Consistent with the purpose of the revision the revisors moved the wartime Suspension Act, old Title 18 U.S.C. § 590(a),

into the new code as § 3287 of Title 18 U.S.C.A. We turn to the consideration of that statute and to whether it effected the suspension of the running of the three-year statute of limitations.

### The Applicability of the Wartime Suspension Act

The Wartime Suspension Act, 62 Stat. 828, is cast in three numbered classes. The government views class (1), which suspends the running of the general limitation statute until proclamation of cessation of hostilities as to offenses "involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not * * *", as covering frauds to obtain rights and privileges from the government or which obstruct the government or its agencies in the due execution of law. And pecuniary[9] loss to the government is not a necessary element. Classes (2) and (3) apply to frauds against the government or a government agency in specific instances which involve pecuniary loss to the government.

██ Appellants, opposing the government's view, seek to apply the rule of *ejusdem generis* to the Act and argue that since classes (2) and (3) refer to frauds of the same nature, class (1) is limited to frauds of the same nature. We pass this contention by quoting from United States v. Gilliland, 1941, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598:

"'The rule of *"ejusdem generis"* is applied as an aid in ascertaining the intention of the Legislature, not to subvert it when ascertained.'"

Appellants also argue that the legislative history supports the view that only pecuniary frauds were contemplated by the Congress. We think the government's view of the Act is supported by the face of the Act and that no ambiguity is present which requires reference to the legislative history. However, we think the history, some of which we set out in the margin,[10] does not support appellant's view.

9. For facility of expression in this opinion, we have expanded the meaning of the word "pecuniary" to include any and all property of value.

10. House and Senate Reports (No. 2051, House Misc.Rep. III, and No. 1544, Senate Misc.Rep. IV, accompanying the bill which became the Act of August 24,

We shall proceed to look at the case authorities. But before doing so, it is well to have in mind that not every fraud against the government, whether inherently pecuniary or otherwise, comes within the effect of the Suspension Act. There are offenses for which specific statutes of limitation apply and there are offenses which encompass acts inherently fraudulent as to the government but in which the fraud is not an ingredient and need not be proved. The Suspension Act does not apply in such circumstances if the decisions relative to the provisos considered in Noveck, McElvain and Scharton, hereinafter cited, are to rule. See our note 15a.

## The Case Authorities

United States v. Gottfried, 2 Cir., 1948, 165 F.2d 360: Gottfried and others were involved in frauds to obtain more sugar than their legal ration. Gottfried and his corporation were indicted for making a fraudulent statement, and Gottfried and two others were indicted for conspiracy to defraud the government. The specific fraud alleged was that the government should be deprived of the services of one of its enforcement officers in order to accomplish the illegal purpose. No mention was made as to any pecuniary loss of the government. The court said in part, 165 F.2d at page 368:

"The argument [by appellants]—drawn from the Congressional debates —is that this language should be confined to frauds of those who contracted with the United States or supplied it with materials, and that it does not include interference even though fraudulent which results in no pecuniary loss. Textually this reasoning has nothing to commend it, except so far as the word, 'fraud,' may imply pecuniary loss; and, whatever might be said as a new matter for so circumscribing that word, it has been the law, at least since 1910, that in the statute [§ 80, Title 18 U.S.C.A.] under which this indictment was drawn, 'fraud' includes any conduct, 'calculated to obstruct or impair its' (the United States') 'efficiency and destroy the value of its operations and reports.' [Haas v. Henkel, 1910, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569].[11] We see no reason for reading the words, 'defrauding the United States' in the statute of limitations now in question

1942, 56 Stat. 747, and which, when amended in 1944 became the Act here considered) referred to the need for time "to investigate, discover, and gather evidence to prosecute frauds against the Government". It alluded to the gigantic war program, to the fact that "[h]uge sums of money" were "being expended for materials and equipment", that these dealings would no doubt present opportunities for unscrupulous persons "to defraud the Government or some agency". These allusions suggest fraud causing pecuniary losses. On the other hand, the same report mentions the fact that "[t]he law-enforcement branch of the Government is also busily engaged in its many duties, including the enforcement of the espionage, sabotage, and other laws". This suggests that these agencies were currently too busy with war problems to be able to devote the time necessary to discover frauds against the Government, a condition which would be true of one character of fraud as another.

American Stevedores v. Porello, 1947,

330 U.S. 446, 451–452, 67 S.Ct. 847, 91 L.Ed. 1011, demonstrates that when a statement made in Congress during the pendency of a bill mentions but one purpose to be served by an enactment of language broad enough to accomplish other purposes as well, it cannot be assumed, in the absence of express limitations in the enactment, that it was not intended to serve the other purposes as well.

It appears to us that the legislative history is too equivocal to be determinative here.

11. The court in Gottfried was referring to the following found in Haas v. Henkel, 1910, 216 U.S. 462, 479, 30 S.Ct. 249, 254, 54 L.Ed. 569:

"The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government * * *. That it is not essential to charge or prove an actual financial or property loss to make a case under the statute has been more than once ruled [citing many cases]."

less comprehensively; certainly there was not enough ground for that in the debates of Congress. Besides, the purpose of the amendment was not to let crimes pass unpunished which had been committed in the hurly-burly of war, an overriding motive which perfectly fits the situation at bar."

We are in accord with these expressions.

Following World War I there was in effect a proviso to the statute of limitations which was to some extent the prototype of the Wartime Suspension Act. It is therefore useful to approach the scope of the present Act through decisions made under the former Act.

United States v. Noveck, 1926, 271 U.S. 201, 46 S.Ct. 476, 70 L.Ed. 904: In this case the government was contending that the acts of defendant, the basis of the charge of perjury against him, were inherently fraudulent and therefore a proviso suspending the statute of limitations was applicable. But the court held otherwise, giving the reason for its holding that fraud is not an ingredient of perjury, that perjury can be proved without proof of fraud, and that the proviso to the statute of limitations applies only to those cases in which fraud is an ingredient. The court went on to say that otherwise the same period of limitation would not apply to all offenses of perjury. Those in which the government was defrauded would be under the proviso and all others would be under the general statute of limitations.

As we have already seen, the basic reason for the decision in United States v. Noveck, supra, was that the proviso to the statute of limitations then in effect applied only to crimes in which fraud against the government or any agency thereof is an

ingredient and is a necessary element of proof. That is, since the crime in Noveck was perjury, a crime which may be proved independently of or in the absence of fraud against the government, fraud against the government is an immaterial incident.

United States v. McElvain, 1926, 272 U. S. 633, 47 S.Ct. 219, 71 L.Ed. 451: The indictment was laid under Criminal Code § 37, 35 Stat. 1088–1096, and the charge was conspiracy to defraud the United States in respect of its income tax. The general statute of limitations, § 1044, for criminal offenses was *three* years and under a proviso to it the period within which the indictment could be returned as to certain offenses was *six* years. The government claimed that the proviso was applicable to the charge laid, but the defense thought not. The trial court and the Supreme Court held that the general statute of limitations without the proviso was applicable. For clarity, we shall refer to the section, minus the proviso, as the "main part". Section 1044, complete with proviso, is quoted in note 12.

The opinion of the Supreme Court in United States v. McElvain, supra, is not easy reading and has had various constructions. Without very careful study it mistakenly appears that an inconsistency or miscitation of statutory section has crept into it. The court, it will be observed, says 272 U.S. at page 639, 47 S.Ct. at page 220, 71 L.Ed. 451:

"The crime of conspiracy to commit an offense is distinct from the offense itself",

meaning of course that conspiracy is one crime and the performance of the illegal acts planned or "involved" in the conspir-

---

12. Rev.Stats. § 1044: "No person shall be prosecuted, tried, or punished for any offense, not capital, except as provided in section 1046, unless the indictment is found, or the information is instituted, within three years next after such offense shall have been committed: Provided, however, That in offenses involving the defrauding or attempts to defraud the United States or any agency thereof, whether by conspiracy or not, and in any

manner, and now indictable under any existing statutes, the period of limitation shall be six years. This Act shall apply to acts, offenses, or transactions where the existing statute of limitations has not yet fully run, but this proviso shall not apply to acts, offenses, or transactions which are already barred by the provisions of existing laws." 42 Stat. 220; see also Title 18 U.S.C.A. § 582 (1927 ed.).

acy constitutes another distinct or, according to the court, "substantive" crime.[13]

The proviso cannot relate to any offense not within the terms of the main part of the statute because the proviso is an excepting clause to the rule or law laid down in the main part. Without the proviso, the main part of the statute by its terms covers every offense except capital offenses and offenses arising from the revenue laws. The excepting clause (the proviso) takes all offenses, covered by the main part which "involve" fraud against the United States or its agencies, out of the three-year limitation and fixes instead thereof a six-year limitation.

The case is dealing with an offense of conspiracy but, says the court, 272 U.S. at page 639, 47 S.Ct. at page 220, 71 L.Ed. 451:

"The language of the proviso cannot reasonably be read to include all conspiracies defined by section 37 [because the proviso contains the words 'whether by conspiracy or not' which establishes that it is the substantive offense or the object of the conspiracy which determines the scope of the proviso]. * * * [O]bviously it [the proviso] would be limited to those [conspiracies] to commit the substantive offenses which it [the main part] covers" or, in the language of the proviso, which it "involves". The substantive offense to the conspiracy charged in the McElvain case is not covered or involved in the main part but by specific language it is excluded therefrom. But no "distinct" offense of conspiracy is excluded from coverage of the main part. It follows that the offense charged is within the terms of the main part and not within the excepting part—the proviso. All the rest of the opinion is intended to explain the reasonableness of the decision and the evident intent of Congress but, unfortu-

nately, rather acts to confuse. See note 13a.

Under the doctrine of the McElvain case it is clear that since Count I of our case concerns conspiracy, the substantive offense of which is not excluded from the main part of the applicable statute of limitations, the proviso would apply.[14] The decision and opinion in United States v. McElvain, supra, is not authority for excluding our Count I from the Suspension Act.

United States v. Scharton, 1932, 285 U. S. 518, 52 S.Ct. 416, 76 L.Ed. 917: The statute of limitations with which Scharton was concerned was § 1110(a) of the Revenue Act of 1926, 26 U.S.C.A. § 3748(a), applying specifically to offenses under the revenue laws. Differing from McElvain, the indictment was not for conspiracy, but for violating a "substantive" revenue law and was within the main part of the applicable statute of limitations. There was a proviso to the applicable statute of limitations, § 1110(a), similar to the proviso in McElvain, hence, under the McElvain reasoning the offense was not taken out of the main part. But the proviso was held not to apply because of the principle announced in United States v. Noveck, supra, that fraud against the United States or any agency thereof was not an ingredient of the offense charged. The court sought to find the intent of Congress and in doing so called attention to the fact that the proviso was an excepting clause and therefore was to be strictly construed. The section under which the charge is made, § 1114(b), makes an attempt to evade any tax under the Revenue Act of 1926, an offense without the mention of fraud. "There are, however, numerous statutes expressly making intent to defraud an element of a specified offense against the revenue laws." United States v. Scharton, supra, 285 U.S. at page 521, 52 S.Ct. at page 417, 76 L.Ed. 917.

13. See also Glasser v. United States, 1942, 315 U.S. 60, 66, 62 S.Ct. 457, 86 L.Ed. 680.

13a. The gist of counsel's argument, which the court approved, was 272 U.S. at page 636, 47 S.Ct. 219, 71 L.Ed. 451: "If the proviso in the amendment of § 1044 does not include within its terms frauds exist-

ing under the Revenue Act, then necessarily such proviso does not include conspiracies to commit frauds on the Government under the Revenue Act."

14. See Miller v. United States, 2 Cir., 1928, 24 F.2d 353; Falter v. United States, 2 Cir., 1928, 23 F.2d 420.

Hence, under the Noveck doctrine, the proviso applies only to offenses which encompass fraud as an ingredient.

The statute under which our Count II is laid, 8 U.S.C. § 746(a) (1), has no specific mention of fraud and it can be argued from this fact that the Suspension Act would not be applicable thereto. However, we think the Suspension Act does apply for the reason we shall now set forth. The charge in Scharton was that the accused had made attempts to evade income taxes and the statutory offense, § 1114(b), Revenue Act of 1926, made attempts to wilfully evade or defeat the tax, a felony. There is no specific mention of fraud in the statute defining the offense charged, and the proviso as we have seen is made applicable only to "offenses involving the defrauding or attempting to defraud the United States or any agency thereof", et cetera.

If the cited case must be construed to mean that "fraud" must be spelled out literally in the statute, then logically we must hold that the Suspension Act does not apply to Count II, for although fraud is spefically charged in the indictment, fraud is not specifically mentioned in the statute defining the offense under which the charge is laid.

We think we are not driven to this extreme conclusion. Noveck, McElvain, and Scharton do not foreclose the holding that where the very terms of a statutory offense require proof which necessarily involves fraud or attempted fraud against the United States or an agency thereof, and there is no special Act inconsistent therewith such as is found in McElvain and Scharton, the Suspension Act applies. After all, the Congress was enacting the Suspension Act to preserve the government's right to prosecute those who had tried, successfully or not, to defraud it during the war. It does not seem to be in harmony with Congressional intent nor does it seem otherwise necessary to construe the Noveck doctrine so strictly that it excepts the extension or suspension of statute of limitations from applying to acts which come directly under the offense and which cannot be committed without thereby committing fraud against the United States or an agency thereof. In the circumstances prosecutions under the same statutory offense could not be limited in one case to a certain period and to another period in another case—a strong point in Noveck. Both McElvain and Scharton were controlled by special statutes covering the revenue laws. The trial court held to the view we have suggested and the government adheres to it. We think it is supported by reason and therefore we are not constrained to broaden the Scharton holding to include the instant case. All we have said on this point is but a round-about way of saying that fraud is an ingredient of the offense charged. Such in effect was the holding in Knauer v. United States, 1946, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500. Hence, we hold that the Suspension Act applies to Count II of the indictment. We have already shown that the Saving Clause applies.

Since our Count III does specifically include fraud as an ingredient of the offense charged, it seems obvious that the Suspension Act applies and, for the reasons already given, the Saving Clause applies.

Marzani v. United States, 1948, 83 U.S. App.D.C. 78, 168 F.2d 133: Appellant Marzani was indicted in 1947, tried, convicted, and sentenced for having made false and fraudulent statements in a matter within the jurisdiction of an agency of the United States government in violation of § 80 of Title 18 U.S.C.A. The False Claims Act. Factually, he was charged with having given false answers to questions as to whether he had ever been a member of the Communist Party, ever attended their meetings, etc. The general three-year statute of limitations had run before the indictment was returned and it would have to be dismissed unless the Suspension Act, hereinbefore considered, was effective. The court, after discussing Noveck, McElvain, Scharton, and Gilliland, supra, concluded that the Suspension Act did not apply to the False Claims Act. It gave as its reasons that the False Claims Act did not involve pecuniary frauds, whereas the Suspension Act applied only to offenses which involved pecuniary frauds against the government. We cannot agree with the reasoning in the Marzani opinion, nor consequently with the con-

clusions reached. And the conclusions reached were based upon the court's own conclusions that the Noveck, McElvain and Scharton cases hold that the Suspension Act then in force did not apply to non-pecuniary fraud; hence the present Suspension Act does not. We have analyzed the cases referred to and we think the court's conclusions in Marzani on this point are not justified.

It is true that Gilliland held that the False Claims Act was not restricted to matters in which the government was defrauded in a pecuniary or financial sense. But, while each of the three cases—Noveck, McElvain, and Scharton—was a case involving pecuniary loss, none of these cases held that the proviso could be invoked only when the government had been defrauded in a pecuniary manner. The Suspension Act applies to every offense "involving fraud or attempted fraud against the United States". The word fraud as defined by the Supreme Court in Haas v. Henkel, 1910, 216 U.S. 462, 479, 30 S.Ct. 249, 254, 54 L.Ed. 569, means the "impairing, obstructing, or defeating [of] the lawful function of any department of government". Gilliland reaffirmed Haas v. Henkel by holding that since Congress had removed the words "cheating and swindling" from the False Claims Act, Congress had in effect declared that a fraud need not be pecuniary in nature in order to be covered by the False Claims Act.[15] We therefore conclude that the Sus-

pension Act applies to every offense involving fraud against the government whether pecuniary or not.

Appellants argue that since the Suspension Act applies to fraud "in any manner", whereas the conspiracy statute applies to fraud "in any manner or for any purpose", the two Acts refer to different types of frauds. In their argument they concede that the definition of fraud in the conspiracy statute applies both to pecuniary frauds and to frauds which obstruct the government in its lawful functions. However, they urge that the absence of the words "or for any purpose" in the reference to fraud in the Suspension Act confines the scope of that Act to pecuniary frauds. They rely upon the Cohn case (see our footnote 15, supra) for the conclusion reached. The Cohn case held that the term "fraud" in the False Claims Act, before its 1934 amendment, applied only to pecuniary frauds. However, a careful reading of the Cohn case, and the Gilliland case, shows that fraud in the Cohn case included those of a pecuniary nature only because it (fraud) was coupled with the words "cheating and swindling". And that once the words "cheating and swindling" were deleted, the word *fraud*, standing alone and without any help from the phrase "for any purpose", was held to extend to all frauds whether pecuniary or not. United States v. Gilliland, 1941, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598. See note 15a.

15. In United States v. Cohn, 1926, 270 U.S. 339, 46 S.Ct. 251, 252, 70 L.Ed. 616, the Supreme Court had held that since the False Claims Act, Criminal Code § 35, 18 U.S.C.A. § 80(1927 ed.) as it then read, applied to false claims made "with the intent of cheating and swindling or defrauding the Government of the United States" [emphasis ours], is related only to pecuniary frauds.

However, § 35 was amended June 18, 1934, 48 Stat. 996, by deleting the words "cheating and swindling".

15a. The foregoing discussion as to the application of the Suspension Act to the offenses involved in this case is under the assumption that the proviso to the statute of limitations covering frauds against the United States during the first World

War is in all respects the prototype of the present Suspension Act, and that the Supreme Court decisions under the proviso apply as well to the Suspension Act. We think there is reason for a different view.

In the Noveck, McElvain and Scharton cases the Supreme Court was dealing with provisos added to specific limitation acts. In each case the court gave the proviso a strict construction. This was primarily because they were enacted as provisos. We think the fact that the Suspension Act is cast in a separate independent Act rather than as a proviso to the general statute of limitations and is cast in very inclusive language indicates that Congress intended to avoid the limitations written into the Noveck, McElvain and Scharton opinions.

We conclude as follows:

■ Since fraud against the United States or any agency thereof was an ingredient of each one of the offenses charged and such fraud was not required to be a pecuniary nature, the Wartime Suspension Act applies and the statute of limitations had not entirely run against any count of the indictment when it was returned.

### Res Judicata

The Executive Department of the government has long been concerned with Mr. Bridges. And we take note of that concern solely because it is claimed by the appellants that the actions taken against Bridges effect a legal bar to the instant prosecutions. Because of this important legal point, we turn to the prior proceedings against Bridges.

It is contended by appellants that, prior to the return of the indictment, it had been adjudicated that Bridges was not, at the time of his naturalization and that he never had been, a member of the Communist Party; and that it is a denial of due process of law under the Fifth Amendment to refuse to apply the doctrine of *res judicata* to this case.

■ We think it sufficient to quote briefly from the Supreme Court opinion in Southern Pacific R. Co. v. United States, 1897, 168 U.S. 1, at page 48, 18 S.Ct., 18, 42 L.Ed. 355:

> " * * * a right, question, or fact *distinctly* put in issue, and *directly* determined by a *court* of competent jurisdiction, as a *ground of recovery,* cannot be disputed in a subsequent suit between the same parties or their privies; and, even if the second suit is for a different cause of action, the right, question, or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified." [Emphasis ours.]

In 1938, the Secretary of Labor, then in charge of Immigration and related subjects, issued a warrant for the arrest and deportation of Bridges, an alien, charging that at the time he entered the United States he was a member of or affiliated with a defined class of aliens who advocated overthrow of the government by force and violence. Title 8 U.S.C.A. § 137(c) and (g). Dean James N. Landis, acting as an official of the executive department of the government but not as an arm of the judicial department, heard the evidence and held that it established neither membership nor affiliation with the deportable class. The Secretary of Labor approved Dean Landis' report and dismissed the warrant.

■ We hold that the proceedings do not act as an estoppel to, nor *res judicata* of, the prosecutions in the present action, primarily because the cases which apply the rule of the Southern Pacific case, supra, do not extend the doctrine of estoppel by judgment beyond the findings of "a court of competent jurisdiction". Furthermore, the Supreme Court has specifically said that since an administrative board is an instrument of the executive power and not a court, the doctrine of *res judicata* cannot be applied to its decisions. Pearson v. Williams, 1906, 202 U.S. 281, 26 S.Ct. 608, 50 L.Ed. 1029. An administrative decision does not preclude a subsequent administrative consideration of the identical matter, Mock Kee Song v. Cahill, 9 Cir., 1938, 94 F.2d 975; Flynn ex rel. Ham Loy Wong v. Ward, 1 Cir., 1938, 95 F.2d 742; therefore a decision of an executive agency cannot act as a bar to subsequent judicial proceedings.

### Bridges v. Wixon

Bridges also cites his 1940 deportation hearing and the related Supreme Court decision in Bridges v. Wixon, 1945, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103, as establishing that he was not a Communist at any time up to 1940, and that this issue in our case is *res judicata.* Of course, the issue in none of the former hearings was as to Bridges' being a Communist. Under the Smith Act [16] and under the applicable law in Schneiderman v. United States, 1943, 320

16. 54 Stat. 670, 671, Title 18 U.S.C. 1946 Ed. §§ 10, 11, now 18 U.S.C.A. 1948 Rev. § 2385.

U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, an allegation that a person was a Communist was not per se an allegation of a crime, while the allegation that one conspired to destroy the government by force or violence stated a crime.

As for the administrative hearing, it would not be *res judicata* for the same reasons as assigned to the 1938 hearing before Dean Landis. Moreover, it would not appear that Bridges would want us to rely on the findings of Judge Sears (sitting as a hearing officer of the executive department) in the second administrative hearing, which were to the effect that Bridges had been both affiliated with and a member of the Communist Party, an organization which advocated the overthrow by force or violence of the government of the United States. Although Judge Sears' findings were reversed by the Board of Immigration Appeals, they were reinstated by the Attorney General. Regulations of the Immigration and Naturalization Service, 8 C. F.R. (1940 Supp.) §§ 90.3 and 90.12.

However, the 1940 hearing and resulting arrest for deportation led to a decision of the Supreme Court in the case of Bridges v. Wixon, supra. But even though we assume that Bridges and the United States were parties to both the Wixon case and the present case, the doctrine of *res judicata* is not applicable unless the two cases have a common question or fact which has been "distinctly put in issue and directly determined". Southern Pacific Co. v. United States, supra. The issue of whether or not Bridges was a Communist, and therefore made a false statement when he denied such party membership, is thus reduced to a determination of whether or not Bridges v. Wixon, supra, actually held that Bridges had never been a Communist.

### Comparison of Bridges v. Wixon and the Instant Case

In Bridges v. Wixon, supra, Bridges sued for a writ of habeas corpus to compel the Immigration Director to release him from custody. In the instant case Bridges is under indictment for conspiracy to defraud the United States by defeating the administration of its naturalization laws and for making false statements under oath in a naturalization proceeding. The causes of action in the two cases are different. Therefore, the second cause of action is not barred by the judgment in the first. However, under the definition of *res judicata* given in the Southern Pacific case, certain facts, having once been determined in a final judgment, cannot be relitigated in any subsequent action between the same parties.

After careful study of the Supreme Court's opinion, we have reached the conclusion that Bridges v. Wixon, supra, did not decide that Bridges had never been a Communist. The Supreme Court stated in the majority opinion, 326 U.S. at page 149, 65 S.Ct. 1443, 89 L.Ed. 2103, that the administrative agency gave too loose a meaning to the term "affiliation" as proscribed by Title 8 U.S.C.A. § 137(c), and (e), and had also improperly received evidence of Bridges' membership in the Communist Party in the form of an unsigned statement purportedly made by one O'Neil who denied making the statement. The Supreme Court, therefore, concluded that the administrative decision approving an executive order to deport Bridges could not be sustained since it was not suported by substantial evidence. The matter in court was habeas corpus, and the Communist issue was not in the case. The holding of the Supreme Court was as follows, 326 U.S. at page 156, 65 S. Ct. at page 1453, 89 L.Ed. 2103:

> "Since Harry Bridges has been ordered deported on a misconstruction of the term 'affiliation' as used in the statute and by reason of an unfair hearing on the question of his membership in the Communist party, his detention under the warrant is unlawful."

In other words, while the administrative decision to the effect that Bridges was a Communist and deportable, was overturned, there was no judicial determination that Bridges was not affiliated with nor a member of the Communist Party. Bridges v. Wixon, supra, goes no farther than to declare what was the proper administrative procedure to be followed. It did not reach, and there was no need for the decision in that case to reach, the question of whether

or not Bridges actually was a Communist. Therefore, we conclude that Bridges v. Wixon, supra, is not *res judicata* to the case here on appeal.

### The Bridges v. Wixon Opinion
### By the Supreme Court as Evidence

The Supreme Court opinion in Bridges v. Wixon, supra, was offered in evidence by appellants Schmidt and Robertson to show that they, having read the opinion, relied in part thereon in reaching the conclusion that Bridges was not a Communist. However, the opinion was excluded as immaterial and incompetent. Since it was not negatived in that case that Bridges was a Communist, the trial court did not err in excluding it from evidence offered on behalf of Schmidt and Robertson to show their state of mind. The case was of no probative value on the point of Schmidt's and Robertson's knowledge or lack thereof regarding Bridges' membership in the Communist Party, and because of the nature of the issue involved in the case and the narrow scope of the decision, its introduction into evidence could not have been explanatory of Schmidt's and Robertson's beliefs, but could only have served to confuse and mislead the jury. The trial judge's decision to exclude Bridges v. Wixon from evidence was well within the limits of due exercise of his discretion.

### Double Jeopardy

The next point raised by Bridges on this appeal is the issue of double jeopardy. The Fifth Amendment of the United States Constitution states that no person shall be

"* * * subject for the same offence to be twice put in jeopardy of life or limb * * *."

It is in effect Bridges' contention that the two attempts which were made in the past to deport him as an undesirable alien in reality placed him in jeopardy of "life or limb", and consequently he is shielded by the Constitution from the present conviction for conspiracy to defraud the United States.

■ Bridges has not been subjected to double jeopardy. At no time during the deportation proceedings was Bridges subjected to peril of life or limb. He was detained solely for the purpose of deportation, not for punishment. Furthermore, the identity of "offenses", necessary for the invocation of the protection against double jeopardy, is lacking since conspiracy and the defrauding of the United States by making false statements to procure naturalization for one not entitled thereto, are distinct crimes which have no relevance to the deportation hearings. Cf. United States v. Williams, 1951, 341 U.S. 58, 62, 71 S.Ct. 595, 95 L.Ed. 747. For, as the Supreme Court said in Bugajewitz v. Adams, 1913, 228 U.S. 585, 591, 33 S.Ct. 607, 609, 57 L.Ed. 978,

> "The determination [by an administrative body that an alien should be deported] by facts that might constitute a crime under local law is not a conviction of crime, nor is the deportation a punishment; * * *."

See also Helvering v. Mitchell, 1938, 303 U.S. 391, 398, and footnote at page 399, 58 S.Ct. 630, 82 L.Ed. 917; Ex parte Bridges, D.C.1943, 49 F.Supp. 292, reversed in Bridges v. Wixon, supra, on other grounds; United States v. Bridges, D.C.1949, 86 F.Supp. 922, 928.

■ Of course, habeas corpus is not a criminal proceeding and a hearing for the writ or a decision upon such hearing cannot put a person in jeopardy. All that can come from a proceeding in habeas corpus of the type used in Bridges v. Wixon, is a determination upon the issue of the detention of a person.

### Due Process

Bridges' contention that he has been denied due process of law by virtue alone of the several deportation proceedings and the present criminal indictment and conviction, is without merit. Whatever may be said as to the institution of the several proceedings, Mr. Bridges has been accorded every constitutional right in the instant case. The circumstance that phases of the former hearings and of this case are to some extent interrelated, afford no ground for the claim that due process had not been accorded each and every of the defendants-appellants.

## Materiality

There was, at the time in suit, no statutory bar to any alien's naturalization on account of membership in the Communist Party,[17] and possessing such membership was not a crime. There was, however, a bar against naturalization of one who adhered to the belief that this government should be changed by force or violence, and such adherence was a legal ground for deportation. False denials of such membership at a naturalization proceedings were material. The Russian brand of Communism and works of Karl Marx and Lenin were well known and their teachings of the doctrine of overturning our government by force and violence was common knowledge. Had Bridges answered the court's question in the affirmative, the next line of questions which logically would have followed would have been as to whether Bridges believed in the violent overthrow of the government. From the answers received, the court would determine whether the applicant was devoted to the United States Constitution, and whether as a matter of fact and law Bridges qualified as a person entitled to citizenship.[18] The case of Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, is not in point.

## The Third Count: Aid and Abet

Schmidt and Robertson present the theory that the third count of the indictment does not state an offense because there is nothing in the indictment which indicates that Bridges was not entitled to citizenship. The intent of the argument is that even if Schmidt and Robertson did aid and abet Bridges in his naturalization proceedings, the only fact alleged as disqualifying Bridges was that he was a member of the Communist Party, and that such membership was no offense, citing Schneiderman, supra. Hence, that there could have been no fraud.

The fallacy in this theory lies very close to the surface. It is true that as of the time in suit, membership in the Communist Party or being a Communist was not a crime. It was, however, a crime to commit a fraud against the United States or any agency thereof. Aiding and abetting an alien toward securing the great privilege of citizenship through misrepresentation of a fact, which could well be the basis of a refusal to grant it,[19] is well within the terms of the indictment. It is idle nonsense to argue that adherence to a plan of government as contradictory and inconsistent as Communism is to our plan of government would be an improper or inconsequential subject

17. But see Amendment to Nationality Code, 1950, 8 U.S.C.A. § 705, 64 Stat. 1013, and the Immigration and Nationality Act of 1952, Act of June 27, 1952, c. 477, Public Law No. 414, § 212(a)(28)(C), 8 U.S.C.A. § 1182(a)(28)(C).

18. Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 72 S.Ct. 512, a recent Supreme Court case dealing with the deportation of aliens under the Alien Registration Act of 1940, 54 Stat. 670, 8 U.S.C.A. § 137, settles to a certainty that the questions of the court, as to Communist membership, were material to the naturalization proceeding.

The Alien Registration Act of 1940 provides for the deportation of any aliens who "believe in, advise, advocate, or teach, or who are members of or affiliated with any organization, association, society, or group, that believes in, advises, advocates, or teaches: (1) the overthrow by force or violence of the Government of the United States or of all forms of

law, * * *." 8 U.S.C.A. § 137(c) and (g). The identical language is found in Title 8 U.S.C.A. § 705(b) wherein the grounds for denying naturalization to an alien are set forth. Although Harisiades had been, but no longer was, a Communist, nevertheless he was ordered deported under the mandate of the Act. Therefore, if Bridges had confessed membership in the Communist Party at the time of his naturalization hearing, he too would have been subject to deportation. In view of the fact that Communist affiliation places an alien within the coverage of the Alien Registration Act, had Bridges spoken the truth at the naturalization hearing, it would have constituted good cause for the denial of the petition. For the statutory definition which makes an alien deportable also makes him ineligible for citizenship. 8 U.S.C.A. §§ 137(c) and 705(b). footnote 18 supra.

19. See Harisiades v. Shaughnessy, our footnote 18 supra.

of inquiry in connection with a Naturalization proceeding.

### Father Meinecke

Father Meinecke was called as a defense character witness to testify regarding Bridges' reputation for truth, honesty, and integrity. The court took part in the examination of the witness, and the defendant contends that the nature of the questions asked by the court were so phrased as to discredit the testimony of the witnesses before the jury.

While the questions of the court might be subject to misunderstanding, that danger was cured by subsequent instructions to the jury.[20] Furthermore, as the Supreme Court said in Glasser v. United States, 1942, 315 U.S. 60, 83, 62 S.Ct. 457, 470, 86 L.Ed. 680.

"Perhaps the court did not attain at all times that thorough-going impartiality which is the ideal [we intimate nothing of the kind here], but our examination of the record as a whole leads to the conclusion that the substantial rights of the petitioners were not affected. The trial was long and the incidents relied on by petitioners few. We must guard against the magnification on appeal of instances which were of little importance in their setting."

In any event, whether or not the court's conduct in regard to Father Meinecke constituted error, it was not so prejudicial as to warrant reversal. For Father Meinecke, in order to be a valid character witness, must testify as to the defendant's reputation in the community. Father Meinecke testified only as to his personal opinion, which is generally inadmissible. Wigmore on Evidence, 3rd ed., § 1980. And in addition to Father Meinecke, there were eleven other character witnesses who testified in Bridges' behalf.[21]

### Limit on Scope of Cross-Examination

In the course of the trial the government put Lawrence R. Kessler, an agent of the Bureau of Naturalization, on the witness stand for the purpose of identifying a hotel registration card which the government wished to have placed in evidence. The evidentiary value of the card was to show that Lewis Michener, Jr., another government witness, was in San Francisco in August, 1940, to attend a Communist Party meeting at which, he testified, Bridges was also present. On direct examination Kessler's testimony was confined to identifying the exhibit. Counsel for defendant Bridges sought to attack Kessler's credibility on cross-examination on the ground that the only purpose of Kessler's testimony was to bolster Michener's testimony. The

20. Record on Appeal, pages 4385–4387: "The Court: * * *. Ladies and gentlemen of the jury, * * *.

"Latterly, in my examination of Father Meinecke some mention was made by counsel concerning the asserted impropriety of a question on my part to the father. I might say to you that that was not born of any desire on my part, nor was it designed to inquire into Father Meinecke's mental processes. Nor was it to reflect upon his integrity. The question was born and conceived out of a desire on my part to accord fairness to the witness, for the reason that mention was made during the course of this testimony that he left San Francisco for Nevada; an inference might be drawn from that departure that it had something to do with activities in trade unionism and the like. The father on the witness stand volunteered that he asked to be transferred. I merely wanted to inquire, ladies and gentlemen, a very sim-

ple question, not born of curiosity on my part, but born of a desire to provide you with all the facts surrounding the father, and it was to the end that I could inquire as to his health. Very many people have to leave large metropolitan areas to go to less burdensome parishes and that was the reason underlying my question."

21. The testimony of each character witness is found at the page number of the Record on Appeal cited after his name:
Frank M. Andrews (page 4699),
Stanley Bailey (page 4483),
Hubert Brown (page 4049),
Walter E. Buck (page 3921),
Daniel F. Del Carlo (page 4199),
Dr. Leo Eloesser (page 3839),
Kenneth H. Finnesey (page 4058),
Augustin F. Gaynor (page 4207),
Robert W. Kenny (page 4258),
Dewey Mead (page 3998),
Oscar W. Pearson (page 4036),
all prominent men in their various vocations and professions.

court limited the scope of the cross-examination to matters pertaining to the card and precluded impeachment as it is within the discretion of the trial court to do. Glasser v. United States, 1942, 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Fotopulos, 9 Cir., 1950, 180 F.2d 631, 640; Chevillard v. United States, 9 Cir., 1946, 155 F.2d 929, 935; United States v. Toner, 3 Cir., 1949, 173 F.2d 140, 144.

Counsel for defendant challenged the court's right to limit the scope of the cross-examination in this instance. The court in reply read from a prepared memorandum on the point of law. And while reading the memorandum in the presence of the jury, the court quoted from Morton v. United States, 7 Cir., 1932, 60 F.2d 696, 699, as follows [at page 3609 of the Record on Appeal]:

"The battle continued, not to ascertain the truth, but in the evident hope that error might be injected into the record and ultimate conviction thereby avoided. But avoidance of a conviction, upon uncontradicted evidence establishing to a certainty the guilt of the accused, * * *."

The court prefaced its reading of the above passage from the Morton case with the statement addressed to defendant's counsel that

"* * * the language used in this Morton case is somewhat reminiscent of your expectation or hope that some error might be created in the record."

Defendant labels the above quoted language of the trial court as such flagrant prejudicial misconduct as to constitute reversible error. However, the court ordered the statements stricken from the record and in addition instructed the jury as follows:

"During the course of the trial, the Court has been called upon to make comments in ruling upon objections of counsel and motions made by them. It has also occurred during the trial that the court has been called upon to admonish and reprimand counsel in connection with the conduct of the trial of this case. The jury shall not draw any inference from any such remarks or comments or rulings of the court that the court was intending to convey to the jury in any manner whatever its view or opinion as to what the verdict or decision of the jury should be. Such comments as the court may have made in that regard were only pursuant to the power and, indeed, the duty of the court to supervise the trial of the case and to expedite it."

It appears that the court recognized that the reading was in poor discretion and sufficiently admonished the jury to disregard it. The jury system would be faulty indeed if it must be held that jurors are so easily misled. There are few cases of long and tedious sessions with contentious counsel in which the judge has acted in true idealism. Moreover, since the criticism of counsel in connection with a technical point of evidence does not reflect upon the parties, the court's statement was not prejudicial to the defendants. Goldstein v. United States, 8 Cir., 1933, 63 F.2d 609, 612–614; Mansfield v. United States, 8 Cir., 1935, 76 F.2d 224, 231–233, certiorari denied 296 U.S. 601, 56 S.Ct. 117, 80 L.Ed. 425. We see no reversible error here.

### Instructions to the Jury

#### 1. "Reasonable Doubt"

Appellants contend that certain of the instructions to the jury were plain error and seek a reversal of their conviction for that reason. The first of these concerns the court's definition of "reasonable doubt" as follows:

"The term reasonable doubt means a doubt for which a good reason can be given, in the light of all the evidence." [Page 7885, Record on Appeal]

Appellants maintain that the instruction as quoted puts on them the burden of establishing a doubt. Appellants' analysis of the effect of the instruction is incorrect, especially when considered in connection with the succeeding part of the instruction:

"It means a doubt which is substantial and not merely shadowy. It does not mean a doubt which is merely capricious or speculative. Neither does it mean a doubt born of reluctance on the part of a juror to perform an unpleas-

ant duty, or a doubt arising out of sympathy for a defendant or out of anything other than a candid consideration of all the evidence presented."

Instructions may not be taken apart and a phrase here and a clause or even a sentence or paragraph there used to find error. The criticized portion of the instruction, when read in its context, plainly informs the jury that "reasonable doubt" means no more or less than the plain meaning of those two words as used. Furthermore, while this instruction on reasonable doubt is not to be commended, it does not constitute reversible error.[22]

## 2. Credibility of Witnesses

 Appellants charge error as to the instructions on credibility of witnesses. One part objected to is as follows:

"If the witness has the appearance of attempting to the best of his ability to tell the truth, and other circumstances tend to establish that situation, then you give full credit to his testimony."

The court continued, and this portion of the instruction is not objected to:

"But if you are impressed that the witness is attempting to hide something or is not telling the whole truth, then you have the right to give only such consideration to his testimony as you may think it entitled to receive."

This instruction is not unfavorable to appellants. It merely acts as emphasis to the obvious principle that because a witness testifies to a fact, a juror does not have to believe it. He should determine according to his best judgment in the circumstances.

 Objection is also made to the further instruction on credibility to the effect that the jury should consider the interest which a witness, particularly the defendant, might have in the outcome of the trial. Such an instruction was neither improper nor prejudicial. Reagan v. United States,

1895, 157 U.S. 301, 311, 15 S.Ct. 610, 39 L. Ed. 709; Fredrick v. United States, 9 Cir., 1947, 163 F.2d 536, 550, certiorari denied 332 U.S. 775, 68 S.Ct. 87, 92 L.Ed. 360. Moreover, there was no objection to the credibility instruction as required by Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A.

## 3. Discrepancies and Inconsistencies in Testimony.

 Appellants claim error in the instruction on discrepancies or inconsistencies in the testimony of witnesses. In effect, the jury was told not to be misled by discrepancies of a minor nature or discrepancies in the testimony immaterial to the issue of the guilt or innocence of the defendants. The trial was long in time and hard fought throughout and much testimony in great detail was introduced. The instruction was intended to advise the jury, in their deliberations, not to leave the ultimate question of guilt or innocence for questions which, when resolved, would be of no help in their main problem. The instruction was not erroneous.

## 4. Conspiracy

 Two instructions on conspiracy are assigned as error. The first instruction is to the effect that conspiracies need not be proved by direct evidence, and it was both necessary in order that the jury not be misled and well established at law. Nye & Nissen v. United States, 9 Cir., 1948, 168 F.2d 846, 852, affirmed 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; Blumenthal v. United States, 9 Cir., 1946, 158 F.2d 883, 889, affirmed 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154; United States v. Manton, 2 Cir., 1938, 107 F.2d 834, certiorari denied 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012. The second instruction, on the degree of participation necessary to make a person a part of a conspiracy, was not unfavorable to the defendants. It was, in part, [page 7900, Record on Appeal]:

22. Owens v. United States, 9 Cir., 1904, 130 F. 279; Griggs v. United States, 9 Cir., 1908, 158 F. 572; Louie Ding v. United States, 9 Cir., 1917, 246 F. 80; United States v. Woods, 2 Cir., 1933, 66 F.2d 262, 265; Young v. Territory of Hawaii, 9 Cir., 1947, 160 F.2d 289, certiorari denied 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858; United States v. Farina, 2 Cir., 1950, 184 F.2d 18, certiorari denied 340 U.S. 875, 71 S.Ct. 121, 95 L.Ed. 636.

"It requires more than proof of a mere passive cognizance of a crime on the part of a defendant to sustain a charge of conspiracy to commit it. And you must find that the defendant did some act or made some agreement showing an intention to participate in some way in such conspiracy."

We find no error here. Moreover, no objection was made to the second instruction on conspiracy under Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A., or otherwise.

**5. Judicial Comment on Evidence**

Error is claimed because the court said a certain number of witnesses, naming them, had testified on the issue of Bridges' membership in the Communist Party for the government, and a certain number for the defendant on the same issue, naming the witnesses. Neither in what was said nor from the context in which it was said, was there any suggestion that the number of witnesses should be taken into consideration rather than the effect on the jurors of their testimony. The very full instructions given the jury as to the presumption of innocence, the burden of the government, and the weight and credibility to be given to testimony of witnesses negative any idea that the jurors might have understood that the mere number of witnesses to any point of fact should rule over their judgment in reference to it. See Erie Railroad Co. v. Fritsch, 3 Cir., 1934, 72 F.2d 766, certiorari denied 293 U.S. 620, 55 S.Ct. 213, 79 L.Ed. 708.

**6. Bridges v. Wixon**

That the trial court was correct in excluding from the jury any consideration of the decision of the Supreme Court in Bridges v. Wixon, supra, was fully discussed in this opinion *ante*. We add here only that the court did not err in charging the jury that no inference was to be drawn from the many references to that case which were made by defense counsel during the trial.

**7. Elements of Third Count of Indictment**

We see no merit in appellants' contention that the court in its instructions misstated the elements of the offense charged against Schmidt and Robertson in the third count. The indictment was phrased within the provisions of Title 8 U.S.C.A. 1946 ed., § 746(a)(5)a. There was no reversible error in the court's explanation that the expression "to abet" means,

"* * * knowingly and with criminal intent to aid, promote, encourage or instigate, by act or counsel, or both act and counsel, the commission of such criminal offense."

There was no objection to this instruction under Rule 30, Federal Rules of Criminal Procedure, 18 U.S.C.A., or otherwise.

**8. Criminal Intent**

As for the trial court's instructions on the intent necessary to convict defendants Schmidt and Robertson of any of the counts charged, they were favorable to the defendants. For while Schmidt and Robertson admitted aiding Bridges to obtain citizenship, the court charged that such aiding would not be a crime unless it was with an,

"* * * intent upon the part of either of these defendants to deceive and defraud the Government of the United States."

**9. Materiality**

Appellants argue that the trial court's instruction that the false statements were material to the naturalization proceeding as a matter of law, was erroneous. The question of materiality is always for the court. Sinclair v. United States, 1929, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692; Travis v. United States, 10 Cir., 1941, 123 F.2d 268, 270. And that is also the rule in this circuit despite appellants' misconstruction of the holding in Luse v. United States, 9 Cir., 1931, 49 F.2d 241. For while it is true that in the Luse case this court said that what is material in a perjury case is a mixed question of fact and law, we also said that the question of fact is confined to what actually took place. Once it was determined what took place, the materiality of such facts to the issue was for the court alone. There was no error here.

Appellants are asserting that the evidence introduced at the trial does not support the verdicts returned by the jury. This claimed

reversible error has been explored by each member of the court and the task of expressing the court's views on this subject has been assigned to Judge POPE. His treatment of our conclusions follows immediately.

POPE, Circuit Judge.

We now proceed to state the reasons for the Court's conclusion that the evidence upon each count was sufficient to sustain the verdict.

As to the Second Count—The alleged false statement as to Communist Party membership.

The second count, by which Bridges was charged with knowingly making a false statement under oath, a statement that he did not and had not belonged to the Communist Party, is the key to the indictment. We consider the evidence upon that charge first.

The jury was instructed that in order to convict under this count it must find that there was proof, beyond a reasonable doubt, of Bridges' actual membership in the Communist Party; that "mere association between an individual and an organization does not constitute membership. * * * A person may approve some or all of the aims or activities of an organization, yet this does not make him a member. Even sympathy for the program of an organization, or contributions of money do not create the legal status of membership * * * The law also recognizes that active cooperation with an organization in its activities, does not create the legal status of membership. * * * Even affiliation, if you should find it to exist in this case, would not constitute the same legal status as membership, for the reason that membership refers to something more than, and different from affiliation."

This instruction had practical significance, for a very great volume of the testimony went no farther than to disclose that for a considerable period of time Bridges attended and participated in many Communist meetings, numbers of them "closed" meetings, that is, purportedly open to Communists only; that he presided at some of these meetings and that he frequently sought the advice and help of known Communist leaders and organizers, particularly in planning union activities and the strategy and tactics to be employed by his union during strikes. Similarly it was shown that he and his associates sought and made use of the Communist Party newspapers and printing establishments, and during the same time he frequently had occasion to give expression to opinions disclosing his close following of the Communist Party line. Ten of the Government witnesses who gave such testimony were themselves former Communists. Several of these were former longshoremen or engaged in related work, had been officials of unions in which Bridges had been active, and had been closely associated with him. Some had been engaged in editing Communist newspapers. Others of these witnesses had been organizers for the Communist Party who had devoted particular attention to forming Communist groups or "fractions" among labor unions, and particularly among the unions representing men employed along the waterfront.

The picture which these men drew was, in broad outline, that of a continued effort of representatives of the Communist Party to "infiltrate" the waterfront unions mainly by enlisting union leaders in the Party, and by placing Communist Party members in positions of influence in the unions. Beginning about 1933 there was a greatly increased drive for the organization of labor unions generally. The movement was stimulated, first by the National Recovery Act, 48 Stat. 195, and then by the Wagner Act, 29 U.S.C.A. § 151 et seq. In 1934 a union known as the International Longshoremen's Association, which had been dormant for some time, was brought to life with the aid of the Communist Party. This union, known as ILA, called a strike. Bridges was chairman of its strike committee composed of some 50 members. The strike was a bitter one. The employers attempted to break it by opening the port, and violence ensued. Union strategy, it was testified, was first planned in closed meetings of Communist leaders, and Bridges and his committee carried into effect

the plans thus formulated. In 1935 Sam Darcy, leader of the Communist Party's District 13,[1] conceived a plan to organize the Maritime Federation of the Pacific which united the maritime unions on the Pacific coast. Its organization was promoted by Darcy, and to a lesser degree, by William Schneidermann, who succeeded Darcy. Bridges became president of the San Francisco council of that organization. That council became the joint strike committee for the San Francisco area during a strike which lasted from November, 1936, to February, 1937. In June, 1937, the Maritime Federation of the Pacific voted in favor of affiliation with the C.I.O. In July, Bridges attended a meeting of the National C.I.O. Maritime Committee in Washington, D. C. On the trip he, with the witness Rathborne, then president of the American Communications Association, and himself a Communist Party member,[2] went to New York to try to persuade the national president of ILA to go along on the affiliation with the C.I.O. Bridges and Rathborne, while in New York, visited the National Communist headquarters where they discussed the maritime setup in the C.I.O. with Stachel, Browder and Hudson, party functionaries, and reviewed what the policy of the C.I.O. maritime groups would be, and what the Communist Party policy was. In 1938, during the first constitutional convention of the C.I.O., held at Pittsburgh, Bridges attended a meeting in the William Penn Hotel composed of the members of the Communist Party who constituted the party's "top fraction" of the national C.I.O. Here was discussed the relations of the Party to the C.I.O., and also the possibility of securing the naming of one John Brophy as secretary-treasurer of the C.I.O.[3] Bridges attended other Communist meetings in connection with subsequent C.I.O. conventions.[4]

1. Comprising California, Nevada, and parts of Arizona. District 13 later included Hawaii.

2. Rathborne was later a member of the executive committee of the national C.I.O.

3. Rathborne described this discussion as follows: "The only other matter that I recall being discussed there, after I got my hair combed, was the matter of the election of officers of the newly formed C.I.O., and the fact that there was no dispute or discussion hardly on who the logical choice would be for president. That was John L. Lewis. However, there was some discussion on the secretaryship, and if I remember correctly, it was decided that the Communist forces at that convention should try to prevail upon Mr. Lewis to accept Mr. John Brophy as the secretary-treasurer of the C.I.O., and subsequently Mr. Brophy was not elected, incidentally."

4. The testimony was that at the 1939 C.I.O. convention at San Francisco, John L. Lewis made strong declarations against Communist influence and activity in the C.I.O. At the same convention he abolished the position of west coast director of the C.I.O., (held by Bridges) and ordered that the "present west coast director will be the California director, and I will appoint new directors for the rest of the area." Thereupon, at a Communist meeting held in the Whitcomb Hotel at San Francisco, attended by Schneidermann and others, Bridges advised against making any issue of his demotion, and advised an attitude of cooperation with John L. Lewis. His suggestion was that at the same time the Party's forces should be built stronger down below in the unions, so that, as Rathborne described his statement, "we can have a greater influence and be in a position to more effectively prevent Lewis and his henchmen from red-baiting and taking an anti-party position in the future."

At the 1941 convention Bridges read and introduced a resolution, prepared for him by one Crouch, a Communist organizer, with the aid of William Schneidermann, which urged the then current Communist policy of all-out support of the administration program of aid to the democracies in the war effort.

Another witness, Michener, also a Communist, who had been chairman of the Los Angeles Industrial Union Council, attended the national C.I.O. convention at Philadelphia in 1943. He described a closed Communist Party meeting held during the convention and attended by Bridges and himself and other Communist Party members. At this meeting those present were informed by one Hudson, a so-called "top Communist" that Philip "Slim" Connolly, a Communist Party member who had but recently been elected California State President of the C.I.O., should resign and step

When the various meetings at San Francisco, purportedly Communist Party meetings, and attended by Bridges, are taken into account, they add up to several score. They were described as held for two purposes: one, to plan a Communist-directed strategy of union activity; the other, to plan for the election of Communist members or sympathizers to various offices at union elections.[5]

Of course, under the instructions of the court, previously mentioned, Bridges' participation in these activities, taken alone, would fall short of proof of actual Communist Party membership. The only significance of such acts is what value they may have, circumstantially, as evidence of an opportunity, through frequent association, for Bridges actually to reach a decision to join the Party. One so situated would be more likely, as a matter of natural inclination, to join the group than would be the case of one having no such contacts.

It is true that a number of the witnesses described some of these meetings which Bridges attended, and at some of which he presided, as "closed" Communist meetings. The logical fallacy in concluding from this that Bridges must therefore have been a Party member is that it assumes the truth of that which is sought to be proven. If, in fact, Bridges was not a Party member, his presence at such a meeting would mean no more than that he attended a meeting at which every other person present was a Party member.

Bridges himself made no effort to deny his frequent attendance at meetings attended by Communist Party members, or his acceptance of aid and assistance from the Party and its leaders, or his sympathy with many of its objectives.[6]

down in favor of a non-Communist. The reason given for this proposal was that the Los Angeles Industrial Union Council, which was Communist controlled, had some members on the national C.I.O. payroll, and that by making this concession as to Connolly, the Party would have a better chance to control those salaried positions. Michener and Bridges both opposed the proposal until Hudson pointed out that the decision had been made by the top leaders of the Communist Party at New York. Bridges and Michener then proceeded to make the arrangements to carry the decision into effect, and Connolly's resignation was secured.

5. The activities of what the witnesses called Communist Party units, or "fractions", in assuming leadership in the trade union movements with which Bridges was connected, were described in much detail. In general these activities would be recognized by the jury as making a likely pattern of behavior, and fitting into what has now become generally recognized as the shape of Communist missionary enterprise. "In the countries outside Russia the Communists have posed as the champions of the under-dog; they have espoused democratic programs; they have indeed purported to be the faithful advocates of the cause of every exploited race and class. To be sure, they have followed the zig-zag of the Party Line—condemning Hitler, then praising him, then condemning him again; calling Roosevelt a fascist and a war-monger and later praising him as a great leader. But somehow the Communists have by adroit exploitation of propaganda defied logic and tried to use each of their positions to strengthen their reputation as a champion of the poor and oppressed." From a review of Sidney Lens' "The Counterfeit Revolution" by Justice William O. Douglas in "The Progressive", V. 16, No. 6, p. 30, June, 1952. See, also, the statement of Mr. Justice Jackson in American Communications Ass'n v. Douds, 339 U.S. 382, at page 430, 70 S.Ct. 674, 94 L.Ed. 925.

6. Bridges testified to the early efforts of himself and his associates to organize the waterfront workers, and in this connection told of the sub-standard working conditions which confronted the longshoremen, the inadequate pay, the lack of job security, the company-controlled unions, the unfair discriminations in respect to hiring, the "shape-up", the blacklists, the speedup, the system of "kickbacks" to bosses, required as a condition to employment. He said that it was to eliminate these and other claimed evils that the strikes were called, and that it required great effort on the part of the union leaders to hold the strikers together. In this situation, he and the other union leaders sought help wherever they could find it. He gladly accepted aid offered by the Communists. He said: "I am not going at this late stage to try to take away any of the credit they are entitled to, because they did contribute something towards helping the strike.

Bridges further stated that the union was offered the support of the Communist Party and of its paper "The Daily Worker" which printed a daily bulletin for the use of the union during its strikes. He and his associates accepted this offer of help.[7]

Bridges did deny being present at a few of the fifty or more meetings which various witnesses described with particularity, all of them Communist meetings. He denied the account of a meeting held at night in a prune orchard in Santa Clara County where a witness testified Bridges and others met Earl Browder. He denied that he attended a Communist convention at Fresno, and he denied attending a meeting near Grants Pass, Oregon, as to which some testimony was given. He made no effort to take issue as to numerous other meetings at which witnesses stated he was present, and which were described as Communist meetings.

The record also contains some evidence of the expression by Bridges from time to time of opinions on national and world affairs which are indicative of his sympathy with the Communist point of view. Such evidence, like the evidence of Bridges' attendance at meetings with Communist party members, would not in itself suffice to furnish the required proof of Communist party membership.[8]

> We were grateful for it at that time; the men were grateful for it, and I just think it would be crawfishing and ingratitude to try to kiss it off now and say we never had anything to do with them, because they did help in the way I have said, not only with the helping to print the bulletin and with what financial donations as well as food donations they could get, as well as they—when we called upon all organizations, particularly labor organizations, to help us man the picket lines, the Communist Party responded to that call, too, and so did other parties, so did—not the Republican or Democratic Parties; they were darned conspicuous by their absence, but I mean the smaller minority political parties. I recall at that time there was the Proletariat Party around here, there was the Workers Party, the Socialist Workers Party; there were several. Most of those radical, left-wing parties, and they more or less vied with each other to try to prove to the longshoremen and the other strikers how much they were helping. And by and large, the role of all that was pretty much magnified, particularly, the role of the Communist Party was played up purposely by the shipowners and Industrial Association and the city departments, for a reason, and the reason was hysteria so that it was easier to break the strike under that smoke screen of hysteria."

7. During the 1934 strike San Francisco had an anti-picketing ordinance in effect and the men on the union picket lines were charged by the police who attacked with clubs and tear gas. On July 5, 1934, the 30,000 men on strike undertook to mass on the picket line and this was followed by an all day battle with the police in which many persons were shot and two men were killed. Some of the wounded men were taken to 128 Haight Street, San Francisco, which was a Communist headquarters and which was used as a hospital as it was made available to the strikers. The battle led to the calling out of the National Guard but the union and the Communist Party proceeded to hold a mass funeral for the two men who were killed, a feature of which was a parade up Market Street and a grave-side speech by Sam Darcy at the burial of the man who was a Communist.

8. In December, 1945, Bridges' union, the ILWU, called a one day coastwise work stoppage for the purpose of propagandizing the hasty return of American troops from overseas. Bridges testified he did not know this was the Communist Party line, but said that he did not care, either then or now.

In an article written by him and published under date of November 14, 1947, Bridges said, "Thus stripped of all camouflage the Marshall Plan is a scheme to use money and food of the American people to purchase and turn over to Wall Street at practically no cost to the private interests, the basic industries and raw materials of Germany and all western European nations."

At a convention of the ILWU in San Francisco in April, 1947, a resolution was proposed which stated, among other things: "Communism is not an issue in the United States, nor are our economy, political democracy or civil liberties threatened by agents of the Soviet Union. The real threat stems directly from the greed and desire for imperialistic world control of American trusts and monopo-

lies." Bridges, who was chairman of the meeting, made a long statement in support of the resolution in the course of which he said: "Communism is not a form of government, it is a state of society, it is a system, and it is a system that holds that people cannot exploit other people for profit. It simply means you can't own a factory or a ship and do nothing and live on the fat of the land and clip coupons while somebody sweats and slaves for a living."

In 1948, when the ILWU and the Waterfront Employers Association signed a contract, Bridges' union had demanded that the longshoremen would be under no obligation to serve any vessel or handle any cargo declared unfair by the World Federation of Trade Unions. In 1949 when the CIO withdrew from this World Federation of Trade Unions because it was a "communist-controlled organization", Bridges "bitterly opposed" this move by the CIO. At the trial and on cross-examination Bridges said of the CIO constitutional amendment adopted in November, 1949, prohibiting Communist Party members from serving as officers or members of the executive committee of the CIO: "But if you would ask me what I would term it, I would term it a racketeering, corrupt, crooked, cover up for a lot of dirty goings on, so that certain people could use a great organization like the CIO for their own personal political advancement."

The danger of attempting to prove any person to be a Communist by evidence of his expression of views which happen to coincide with the program of the Communist Party, is too well understood to require comment here. However, it cannot be said that the evidence thus far described, the evidence of continued association and cooperation with Communist groups and the evidence of apparent adherence to the Communist Party line, is, although inconclusive and insufficient in itself, wholly irrelevant to the issue before the jury. For, as we shall shortly disclose, there was a substantial amount of evidence that Bridges in fact joined and became a member of the Communist Party. Obviously the likelihood of Bridges actually joining the party would be affected by the matters thus mentioned. If the Communist Party sought to plant seed which would result in a new member springing up, the success of the effort would depend a great deal on whether the seed fell upon fertile ground.

Schomaker, a former longshoreman, who had held numerous positions and offices in Bridges' union, and who had long been a close associate of Bridges, testified that he himself had been a Communist Party member since 1931. About Thanksgiving of 1933, Schomaker became editor of the "Waterfront Worker", a paper published by a group of longshoremen who were members of the Communist Party. Schomaker testified that on an occasion in November or December of that year he and one B. B. Jones, also a member of the Communist Party, met with Bridges and solicited the latter's membership in the Party. He testified that after considerable conversation, Bridges agreed to join, and after agreeing on a name which Bridges should assume as a member of the Party, Jones produced a printed application card. Schomaker temporarily left the room and after his return Jones exhibited the card to Schomaker who observed Bridges' signature thereon. Jones and Schomaker took the card to the Party headquarters at 37 Grove Street and turned the application over to Sam Darcy. Schomaker testified that on numerous occasions he saw Bridges pay his Communist Party dues to the unit secretary and that he had on occasion received Bridges' Communist Party book which was turned in to the Party headquarters at the end of each year so that a new book could be issued to "Harry Dorgan", which was Bridges' party name.

In the winter of 1935 Bridges and Schomaker were neighbors. Schomaker testified that on one evening during that year he saw a crowd in front of Bridges' home and that Bridges then told him that Bridges' wife had fallen out of the window and asked Schomaker to go to his house and get his Communist Party book "before the snooty reporters" got there.

There was also testimony that in August or September, 1938, Bridges made a talk at a meeting held at the home of one John Shaw in San Francisco which was attended by 30 to 35 people, including William Schneidermann, district organizer for the

Communist Party, and other Communist Party members. Also attending were some persons who were not Communists. During the meeting, as it was described by a Mrs. Harris, a Government witness, Bridges made a speech. She testified: "He got up and talked about the conditions on the waterfront and how they were progressing and how the Communist people, Communist Party was helping, and that, and also about the editorials and writings in the People's World, and he made a plea for us that were there to become members of the Communist Party, and he also stated that he was a member of the Party, of the Communist Party * * * I was flabbergasted when I heard him say that, because he had been accused, and I had heard it denied. And when he made that statement, why, it made a very much impression on me." Substantially the same account of the affair was given by the Witness Schomaker, who was also present.

It is argued on behalf of appellants that the testimony respecting the recruitment of Bridges in the Communist Party in 1933, and the testimony concerning the speech made at the John Shaw residence, is inherently so improbable and so incredible that it must be discarded. The evidence as to the processing of the Bridges membership application was that it had to be submitted to a membership committee or group of persons for investigation and approval. It is pointed out that the claimed admission by Bridges in 1938 that he was himself a member of the Communist Party was made in the presence of a group of persons some of whom were not Communists and some of whom were unknown to Bridges. It is said that it is inconceivable that Bridges, who knew that the Immigration Bureau had for years been attempting to prove him a Communist and to deport him on that ground, would have laid himself open by making a public statement of that character before such an audience, or that he would have turned in an application in writing which, if it fell into the hands of a Government agent, would put him at the mercy of those who had pursued him.

With respect to this contention, it must be observed that in 1933, when the application was said to have been signed, the series of efforts to prove Bridges a Communist had not yet begun. In 1938, at the time of the Shaw residence meeting, Bridges of course knew that the Immigration Bureau was after him. The question for the jury to determine was whether they would credit the testimony that the statement was in fact made. This would involve consideration not only of the reliability of the recollection of the witnesses and their general credibility, but a consideration of whether in the circumstances it could be believed that Bridges was so rash or so incautious as to make such a statement in those surroundings.

The question whether these events did or did not occur was typically one for the jury. In general this case presents no circumstances different from those which constantly appear where the testimony of witnesses is sharply in conflict. The special function of the jury, in our system, is to deal with such matters. No appellate judge is ever in a position to reconstruct for himself, from a printed record, the multitude of things which bring conviction to a juror's mind—the demeanor of the witness, his apparent candor or evasiveness, his assurance or hesitation, and even his facial expressions or the sound of his voice.

Even the cold record here discloses that at the trial, and in the presence of the very jury which was to determine whether he had or had not been a Communist Party member, Bridges was singularly lacking in caution, giving a demonstration which the jury might well consider more remarkable than the actions which Mrs. Harris testified "made a very much impression on me." [9]

9. The circumstance was this: Bridges was on the stand, and his conduct was observed for a good many days during the trial. He knew that the Government was attempting to prove that he was or had been a Communist Party member; he knew that the jury who were observing him were his judges, and yet he apparently overlooked no opportunity during the process of cross-exam-

That Bridges entertained the views he volunteered in comparing the Chinese Revolution to the American Revolution, or which he expressed in respect to the Rus-

ination to make speeches to the jury in what they must have understood was an effort to prove to them the soundness of views generally expressed by World Communism with respect to national and international affairs. Speaking of the Communist conquest of China he said to the jury: "I think the people have finally taken over and changed things, something like they did here in the United States in 1776. I think they have had a peoples' revolution down there, and if they are wrong, then the people of the United States were wrong in 1776."

Further in discoursing upon this subject Bridges stated: "We had the same thing occur after the American Revolution. Remember, after the American Revolution here in—17—this word 'revolution'—people seem to shy away from in these days. I didn't invent the word. But in the days of the American Revolution, like the French Revolution, America, the United States, went through the same thing. All the world was jumping on it and pointing out the Communists in the United States, meaning George Washington, Paine and others. The same thing was happening, and it will happen more and more. So our union can't bear any responsibility. And because we have advocated trade with China in the interests of getting more work for our longshoremen on the waterfront, who unless they get work, of course, they can't have a union, the union will fall apart, and maybe I will have to do something else, even myself,—that is not so much what I am thinking of— but it is as simple as that. The port here, the City of San Francisco, believe me, lives by its waterfront. That is a matter of simple economics. And the bulk of our trade, fifty per cent of the foreign trade that moves through the port of San Francisco was China trade. We have got to reestablish that trade, otherwise we can't have prosperity and employment here in the United States, particularly in the port of San Francisco, and a lot of people around here would be out of a job, and if people are out of work around here, our city, of course, will not have prosperous times and will not have security."

After he had volunteered his views about China, he was invited to express an opinion on the "rape of Poland" and the seizure of Baltic and Balkan countries by Russia. As for Poland, he said, "Here was a country where the govern-

ment collapsed, and the way I looked at it, the country of Russia she took steps to prevent or to meet what eventually transpired, namely, she figured her country was to be invaded and she took certain steps." As for the other countries mentioned, he said, "I would say that there is more democracy in those countries now than before they were seized by the Soviets. Prior to that they were all dictatorships."

Explaining the position he had taken when he "fought bitterly" against a resolution calling for the resignation of executive board members who were unwilling to abide by the anti-Communist amendment to the C.I.O. constitution, he said: "The C.I.O. doesn't elect me to the executive board. My union elects me. I am instructed by my union that elects me and pays my wages to carry out certain policies to this board. I am the voice, the representative of my union on this C.I.O. board. You come in with a resolution now and say that unless I take orders from you, Mr. Murray, notwithstanding what my membership tells me, I am not eligible to serve on this board. I said, 'That is a violation of the CIO constitution, that is a phoney, it is a racket, and if you are going to carry through a policy like that, you are going to destroy CIO'. And that is what is happening to CIO today; it is being destroyed because of those types of policies."

Bridges continued: "So I took this resolution, I came back, I called meetings of my own local union and I said, 'Listen, fellows,' I said, 'Look, here's the way the National CIO wants it. In order to get along with them, let's say we do this. Let's let Phil Murray appoint from the ILWU anyone he wants to represent the ILWU on the board, and let Bridges resign. And let us furthermore instruct the representatives of the ILWU on the CIO executive board that any time Murray says, "Vote yes," to vote yes; any time Murray says, "Vote no," vote no; any time Murray says, "Abstain," to abstain. Let them have that.' And my membership said, 'Look, Bridges, if that is the way you feel, if you carry out a program like that, we will get ourselves another president. We didn't elect you for a program like that. Now, if you haven't got the guts, if you haven't got enough in you to get in there and fight, we will find someone who will do the job for us.' "

sian satellites, or in regard to Phil Murray's effort to oust Communist Party members from official positions in the CIO, is not what seems significant at this point. We do not regard the circumstance here related as of controlling importance. Without it, the question would still be one for the jury. But it is worthy of note that without any apparent effort to confine himself to answering, briefly, and to the point, the questions put to him on cross-examination, Bridges went on at great length with discourses which, we apprehend, must have caused the jury to wonder whether they were watching a man filled with missionary zeal for expounding the views commonly understood to make up the Communist Party line, or one who was supremely indifferent to whether he gave the jury the impression that if he was not a Communist Party member, he must at any rate be a fellow traveler. We cannot say that in these circumstances a jury would be obliged to disregard as impossible or incredible the testimony of what Bridges said and did on the occasions described by these witnesses. Perhaps a man who lacked caution when before the jury, was but acting in a similar manner at the John Shaw home in 1938.

There was other evidence which, if credited, would tend to show Bridges' actual membership in the Communist Party. Three witnesses testified that they attended the national convention of the Communist Party at New York in 1936, and that at that meeting Bridges was elected to the national committee of the Communist Party under the name of "Comrade Rossi". Two of these witnesses testified that he was reelected to the same committee at the national convention of the Party in 1938. There was no testimony that Bridges was present at the 1938 convention but two of the three witnesses as to the 1936 election testified that Bridges was present at that meeting. The third said he did not see Bridges there.

Of course, if Bridges in fact became a member of the governing body of the national Party this would permit an inference that he was a member of the Party. Considerable doubt is thrown on this aspect of the case by reason of the fact that it was established, apparently beyond controversy, that at the very time the 1936 convention was being held, Bridges was in Stockton, California, making a speech at a union meeting. If he was there he could not have been present at the 1936 convention, as two of the three witnesses said he was.

We do not feel called upon to speculate as to whether these two witnesses might have been mistaken as to his presence there, or whether the definite proof of Bridges' presence in Stockton conclusively demonstrates that the testimony relating to the 1936 convention, and perhaps, as to the 1938 convention, was false. We think, for the reasons we have previously mentioned, that there was sufficient other evidence to warrant the jury in finding that Bridges was in fact a member of the Communist Party.

Appellants contend that as a matter of law the evidence was insufficient to satisfy the rule that in perjury cases there must be at least the testimony of two independent witnesses or the testimony of one witness plus independent evidence which is inconsistent with the innocence of the defendant. Cf. Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495. Appellants assert that the evidence that the sworn statement of Bridges was false does not measure up to the standards required by this rule.

The second count of the indictment is not based upon the general perjury statute but upon section 746(a) (1) of the Nationality Act of 1940, now codified at 18 U.S.C.A. § 1015. We need not consider whether the two witness rule applies to a prosecution under this section. Cf. Todorow v. United States, 9 Cir., 173 F.2d 439, 443, certiorari denied 337 U.S. 925, 69 S.Ct. 1169, 93 L.Ed. 1733, for we think that, assuming that the same rule applies as in prosecutions for perjury, the rule was satisfied here.

The falsity of the statement made under oath was testified to by the witness Schomaker who told of the application for membership in the party and the subsequent payment of dues. Mrs. Harris, an independent witness, testified to Bridges' admission of party membership made by him at the public

meeting at the Shaw residence. It is to be noted that this admission was made prior to the date of the alleged crime and there is authority to the effect that admissions so made do not require corroboration to the same extent as others. Warszower v. United States, 312 U.S. 342, 347, 61 S.Ct. 603, 85 L.Ed. 876. In any event, in this case, where the Government did not rest upon the uncorroborated testimony of one witness, but brought forward an accumulation of evidence, circumstantial and otherwise, which supplemented the direct evidence of joining the Party and the evidence of the 1938 admission, we think that the rule was fully satisfied. Maragon v. United States, 87 U.S.App.D.C. 349, 187 F.2d 79, certiorari denied 341 U.S. 932, 71 S.Ct. 804, 95 L.Ed. 1361.

Appellants enumerate sundry reasons why they think we should hold that the evidence offered on behalf of the Government is unworthy of belief. Thus they point to the fact that some of the Government witnesses who admitted having been former Communists also admitted that on prior occasions when under oath and testifying before the un-American Activities Committee or the Tenney Investigating Committee of the California Legislature they had denied being members of the Party. The contention is that one who admits perjury on prior occasions, cannot be credited now.

Again it was developed that some of the Government witnesses had given testimony as Government witnesses in a large number of other cases involving issues similar to those in this case. It is said that such witnesses were professional witnesses as to Communist activities in various places and that hence they were not worthy of credit. Attention is called to the fact that a number of the Government witnesses were naturalized citizens and it is argued that since some of those witnesses had themselves obtained citizenship at a time when they themselves falsely denied Communist Party member-

ship, they were subject to prosecution and hence subject to pressure on the part of Government agents who, it is asserted, held threats of such prosecution over the heads of these naturalized witnesses. Some witnesses received substantial sums of money on account of witness fees and expenses in connection with their attendance at the trial of this case. In the case of one witness not only he but his wife were paid witness fees covering a long period of time. It is argued that the sums thus paid were so substantial that it must be inferred that the recipients would be willing to testify to anything in order to maintain their positions as witnesses.

All of these matters were brought out on cross-examination and developed at great length during the trial. They were the subject of much argument by counsel for appellants at the time the case was argued to the jury and, of course, they are matters in respect to which the jury was the final judge. None of these circumstances would, as a matter of law, require us to throw out the testimony of these witnesses in its entirety.

As to the First Count—The alleged conspiracy.

We next proceed to the question of the sufficiency of the evidence as to the first count of the indictment.[10] This charges that Bridges, Schmidt and Robertson conspired to defraud the United States by impairing, obstructing and defeating the proper administration of its naturalization laws by having Bridges petition for and obtain naturalization by falsely and fraudulently stating and representing that Bridges had never belonged to the Communist Party; that in pursuance of the conspiracy the defendants did and performed four overt acts: 1, the filing by Bridges of his application for a certificate of arrival and preliminary form of petition for naturalization; 2, his appearance on the 8th day of August,

---

10. In dealing with the first and third counts, under both of which Schmidt and Robertson were convicted, and on which they received sentences of equal length, to run concurrently, it must be borne in mind that if the evidence is sufficient to sustain conviction on either count, the sufficiency of the evidence on the other count need not be considered. Sinclair v. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692.

1945, before the naturalization examiner where he gave testimony in the matter of his application for naturalization; 3, the signing on the same day, by Schmidt and Robertson as witnesses, of the Bridges' petition for naturalization; and 4, the appearance of the three men named, on September 17, 1945, in the Superior Court, and their then testimony in support of Bridges' petition for naturalization.

It is contended that there is neither direct nor circumstantial evidence of any such conspiracy; that until June 18, 1945, when the Supreme Court in the case of Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103, reversed the decision of this court, a warrant of deportation based on Bridges' alleged membership in or affiliation with the Communist Party was outstanding against him. This reversal was but five days prior to the filing of Bridges' application for citizenship on June 23, 1945. Hence, it is said, up to five days before the application was made, the warrant of deportation was a bar to Bridges' naturalization and therefore there could be no conspiracy up to that time because naturalization was then impossible. It is argued that there was nothing to show that either Bridges, Schmidt or Robertson had any reason to anticipate questions concerning Bridges' membership in the Communist Party at any time prior to the actual hearing on September 17, 1945, at which time the naturalization examiner was prompted to make the inquiry as to party membership because he had received, a few days previously, an affidavit of Bridges' estranged wife, from whom he was then obtaining a divorce, which stated that Bridges was a member of the Communist Party under the name of "Dorgan". It is contended that the mere fact that the question was then asked was insufficient to bring about a conspiracy to obtain naturalization through the unlawful giving of false answers to such a question.

It is true that the evidence of the alleged conspiracy was entirely circumstantial, as is almost invariably the case where con-

spiracy is charged. There is evidence sufficient to show the existence of a long-standing and close association between Schmidt, Robertson and Bridges in two respects. In the first place all three were long and intimately associated as officers in the I.L.W. U. labor union. There was also evidence sufficient, if believed, to demonstrate that all three of them were associated as members of the Communist party. Not only was there very extensive evidence that Schmidt and Robertson, as well as Bridges, had attended many of the numerous Communist meetings to which reference has been made, but there was testimony that Schmidt had himself solicited the witness Henry Schrimpf to join the Communist Party, and had handed Schrimpf the membership card which he executed. It was testified that Robertson was a member of a top Communist fraction of the State C.I.O. consisting of Communist Party members who were members of the C.I.O. executive board, a group facetiously known in Communist circles as "God's Committee."

The jury could infer from the evidence that Schmidt and Robertson not only knew that Bridges was a Communist and a member of the Communist Party but that there had long existed a controversy between Bridges and the Government officials in charge of matters relating to citizenship and naturalization characterized by repeated attempts to deport Bridges on the ground of his alleged membership in or association with the Communist Party. Schmidt and Robertson therefore knew that if the fact of Bridges' membership in the Communist Party were developed in the course of his naturalization proceedings, it would be fatal to his application. Both of these defendants testified that they knew of the handing down of the decision in the Wixon case [11] on June 18, 1945, and the testimony of both of these defendants discloses that they had the decision in that case very much in mind when they first proceeded to give testimony on Bridges' behalf and

---

11. The opinion in that case was not a part of the record, for it was excluded, as we have noted. What is here referred to is the fact that the case had been decided, and favorably to Bridges, matters which were in evidence.

otherwise assist him in procuring his citizenship.[12]

The evidence warrants the inference that all of these defendants knew that now that the decision in the Wixon case had come down, the day was about to arrive when Bridges could finally sew up his citizenship, and that Schmidt and Robertson were then proceeding to permit him to do so and that they did undertake to assist by testifying, falsely, that Bridges was not a member of the Communist Party.

Under these circumstances it is clear that there was sufficient evidence to warrant a conviction under the conspiracy count, and that the charge of a conspiracy was sufficiently proven.

As to the Third Count,—The alleged aid and assistance by Schmidt and Robertson.

The evidence to which we have just referred sufficiently discloses that there was an abundance of proof to sustain the charge of the third count to the effect that Schmidt and Robertson did wilfully and knowingly encourage, aid, advise and assist a person, namely, Bridges, not then and there entitled thereto, to obtain, accept and receive a certificate of naturalization, which was to be procured and was procured by fraud, said fraud consisting of false and fraudulent statements made in a naturalization proceeding.

It is contended that there is no evidence that a certificate of naturalization was in fact issued. There was introduced in evidence a certified copy of the judgment of the Superior Court reciting that Bridges and other persons had complied with the naturalization laws and that each was entitled to be admitted to citizenship, and re-

citing that "It is hereby ordered that each of said petitioners be and is hereby ordered to become a citizen of the United States of America." There was no evidence that the clerk of that court performed his ministerial duty to issue and deliver to Bridges the certificate of naturalization described in § 736 Title 8 U.S.C.A. We think that in view of the fact that the issuance of the certificate by the clerk is a mere ministerial act following the judgment, as soon as the judgment admitting Bridges to citizenship had been entered there had been accomplished all that was required "to obtain" a certificate of citizenship within the meaning of Title 8, § 746(a)(5) under which the third count was laid, and that in truth the certificate mentioned had then been "obtained". The argument that the evidence as to the third count is insufficient is without merit.

As stated in Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it. United States v. Manton, 2 Cir., 107 F.2d 834, 839, and cases cited. Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances'". This court has followed the same rule. Henderson v. United States, 9 Cir., 143 F.2d 681, 682.

Generally, with respect to the jury's function in weighing testimony and determining the credibility of witnesses this court has said: "With regard to the fore-

12. Thus Robertson testified in enumerating the bases for the answers he gave concerning Bridges at the citizenship hearing, that he had read transcripts of the Landis trial, the Sears trial, and of other investigations and then said: "And finally, a decision of the U. S. Supreme Court came out. I studied that decision. I studied the majority decision and I studied the concurring decision, and I made up my mind then and there that President Bridges was not, had never been, and was never affiliated with the

Communist Party; and the Supreme Court of the United States is something that I think speaks with authority."

In the course of his answer to a similar question Schmidt testified: "Secondly, I had read the decision of the Supreme Court, and I thought well, as long as the highest tribunal in the United States of America has made a decision with respect to this case, the matter is now settled for all time; and I had no hesitation to recommend this man for citizenship."

going testimony, as well as much of the other evidence discussed by the appellants, it should be borne in mind that the question of weight and credibility is for the jury and not for the court." Coplin v. United States, 9 Cir., 88 F.2d 652, 664. Accord: Pasadena Research Laboratories v. United States, 9 Cir., 169 F.2d 375, 380. Tested by these rules, which this court has long followed, Craig v. United States, 9 Cir., 81 F.2d 816, 827, certiorari denied 298 U.S. 690, 56 S.Ct. 959, 80 L.Ed. 1408; Hemphill v. United States, 9 Cir., 120 F.2d 115, certiorari denied 314 U.S. 627, 62 S.Ct. 111, 86 L.Ed. 503; Stillman v. United States, 9 Cir., 177 F.2d 607, 616, the evidence here was sufficient to sustain the convictions on all counts.

BONE, Circuit Judge (concurring).

I am in complete accord with all that has been said by my associates. Their exhaustive opinions reflect unanimous conclusions reached only after thorough discussion in conference and after independent consideration of all issues by each judge of this division of our court.

Judgments affirmed.