**UNITED STATES of America, Plaintiff,**

v.

**Harry Renton BRIDGES, Defendant.**

**No. 28876.**

United States District Court
N. D. California, S. D.
July 29, 1955.

Lloyd H. Burke, U. S. Atty., San Francisco, Cal., Lynn J. Gillard and Robert H. Schnacke, Asst. U. S. Attys., San Francisco, Cal., for plaintiff.

Gladstein, Anderson & Leonard, San Francisco, Cal., Telford Taylor, New York City, for defendant.

GOODMAN, District Judge.

On May 25, 1949, the United States, under the authority of the Act of Congress, approved Oct. 14, 1940, 54 Stat. 1158; 8 U.S.C. § 738, 1946 Ed., filed its complaint herein praying for the revocation and cancellation of the certificate of United States citizenship issued to Harry Renton Bridges by the Superior Court of the State of California, City and County of San Francisco, on Sept. 19, 1945. For ground of cancellation and revocation, the complaint alleged:

(1) that Bridges illegally procured his citizenship in that he was at the time of naturalization, and had been for ten years prior thereto, a member of the Communist Party of the United States, an organization that "during all of said times advised, advocated and taught the overthrow by force and violence of the government of the United States."[1] (2) that Bridges fraudulently procured and obtained his citizenship by then falsely and fraudulently representing to the Naturalization Court that he was not and had not been a member of the Communist Party of the United States.

On the same day, May 25, 1949, the Grand Jury for this District returned an indictment against Bridges and two others charging conspiracy, 18 U.S.C. § 371, and perjury, 18 U.S.C. § 1015(a), in the obtaining of his citizenship, in that his alleged membership in the Communist Party was fraudulently concealed. On September 24, 1949, Bridges filed a motion to dismiss the complaint in this action No. 28876.

On Oct. 12, 1949, in the criminal case, Judge Harris denied a motion of Bridges to dismiss the indictment and stayed all further proceedings in this, the civil

---

1. At the time of Bridges' naturalization, the law made ineligible for citizenship, any applicant who at any time during the preceding 10 years had belonged to an organization which advised, advocated or taught the overthrow of the government of the United States by force and violence. § 305(b)(1) of the Nationality Act of 1940; 54 Stat. 1141; 8 U.S.C., former section 705.

denaturalization proceeding. D.C., 86 F.Supp. 922 and 931.

On April 4, 1950 Bridges and his two codefendants were, by jury, adjudged guilty. Sentence was imposed April 10, 1950. Thereafter, June 16, 1950, Judge Harris entered an order in the criminal case revoking Bridges' citizenship, § 738e Nationality Act of 1940; 8 U.S.C., former section 738e, now 8 U.S.C.A. § 1451(g). The Court of Appeals affirmed the conviction, 9 Cir., 199 F.2d 811 and the judgment of denaturalization, 9 Cir., 199 F.2d 845. The Supreme Court reversed, 345 U.S. 979, 73 S.Ct. 1130, 97 L.Ed. 1393, June 15, 1953 (judgment of denaturalization); 346 U.S. 209, 73 S.Ct. 1055, 97 L.Ed. 1557, June 15, 1953 (judgment of conviction).

Thereafter Bridges' motion to dismiss, this, the civil denaturalization complaint was argued and submitted to Judge Hamlin. It was denied Aug. 12, 1954, D.C., 123 F.Supp. 705.

Thereafter, Oct. 1, 1954, Bridges filed his answer herein. Pretrial proceedings and orders were had and made. Trial was held commencing June 20, 1955 and concluded July 22, 1955.

(A full chronology of the various proceedings of deportation and naturalization involving Bridges, is attached as Appendix A.)

The evidence discloses that for at least six years prior to the grant of citizenship, the government was fully aware that Bridges as far back as 1933, and thereafter, had freely consorted with, advised with, met with, consulted with and was counseled by members, officials and functionaries of the Commu-nist Party. He so testified in his deportation hearings,[2] stating that he did so to promote and help achieve the objectives of the labor unions which he officered. In 1945, when he swore before the Naturalization Court that he was not and had not been a member of the Communist Party or any organization of like purpose, the United States, speaking through a designated naturalization examiner, stated that the government had no objection to the grant of citizenship.[3]

It may well be that Bridges should have been denied citizenship in 1945 upon the ground that he lacked the "good moral character" which the statute made a condition to naturalization.[4] In my opinion, an alien, who knowingly consorted with those who hoped to achieve the overthrow of the government of the United States by force and violence, was not a proper person to admit to citizenship, even though his purpose may have been to achieve success for a labor union. No more so than an alien engaged in the merchandising business, who would seek to justify knowingly conducting his business with criminals, upon the ground that thereby he could develop a profitable business. In this sense, labor union success is no worthier than business success. The moral standard is the same.

But, denaturalization is not a procedure for correcting errors of judgment in the naturalization process. The Appellate process serves that purpose.

The government has conceded that it did not attempt to point the evidence toward anything less than membership in the Communist Party. The sole actual issue therefore, is whether Bridges

---

2. A deportation warrant against Bridges was issued in 1938. On March 28, 1939, Bridges filed a Declaration of Intention to apply for citizenship. His first deportation hearing was before Dean James M. Landis, as referee in July–Sept. 1939. His second deportation hearing was before Chas. B. Sears, referee, March–June 1941.

3. Hearing in the Superior Court, City and County of San Francisco Sept. 17, 1945, Naturalization Examiner, Lloyd E. Garner, appeared for the United States:

The Court (to the Examiner): "Do you have any further questions?"
Mr. Garner: "The government has no further questions."
The Court: "Well, do you have any objections?"
Mr. Garner: "No objection your Honor."

4. § 307a Nationality Act of 1940; 54 Stat. 1142; 8 U.S.C., former section 707, now 8 U.S.C.A. § 1427.

was in fact a member of the Communist Party at the time of naturalization and prior thereto and whether at the same time he fraudulently concealed such membership from the Naturalization Court.

The resolution of this question depends upon whether the government has produced clear and convincing evidence[5] to sustain the allegations of its complaint. The government *has* proved by clear and convincing evidence that the Communist Party is an organization that, at the times here involved, advised, advocated and taught the overthrow by force and violence of the Government of the United States.

But whether it has so proved that Bridges was in fact a member of the Party is a far different question. For it involves appraisement of the weight and credibility of the testimony of witnesses—witnesses testifying as to events, conversations and oral statements made and occurring during a period from 10 to 20 years before this trial. Ten years have passed since Bridges became a citizen. The government elected to proceed with a criminal prosecution, which failed because of its legal outlawry.[6] No legal time limitation bars the prosecution of this cause. But passage of time has much relevance, and rightly so, in evaluating the clarity and persuasiveness of the evidence proffered. The Supreme Court has in effect admonished the inferior Federal Courts to proceed with caution in causes under the denaturalization statute.[7]

The government presented seven witnesses as to Bridges' party membership, of whom five were former members of the Communist Party. The principal of these was one Schomaker. Of the four defense witnesses who testified as to

5. "To set aside such a grant [citizenship] the evidence must be 'clear, unequivocal, and convincing'—'it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt.'" Schneiderman v. United States, 320 U.S. 118, at page 125, 63 S.Ct. 1333, at page 1336, 87 L.Ed. 1796. See also Baumgartner v. United States, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525, and Knauer v. United States, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500; see also United States v. Holtz, D.C., 54 F.Supp. 63, 74.

Clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty. IX Wigmore on Evidence § 2498, page 329 (3rd Ed. 1940); 32 C.J.S., (1942) Evidence, § 1023; 20 Am.Jur., Evidence, §§ 1252–53 (1939). This high standard may be required to sustain claims which have serious social consequences or harsh or far-reaching effects on individuals. E. g. Note, 1940, 128 A.L.R. 713 (degree of proof to establish the illegitimacy of children born in wedlock); Note, 13 Minnesota Law Review 580 (1929) (proof of adultery in divorce actions); Note, 1950, 12 A.L.R.2d 153 (showing necessary for rescission of divorce decree after remarriage); Commissioner of Public Welfare of City of New York, on Complaint of McNamee v. Ryan, 1933, 238 App.Div. 607, 265 N.Y.S. 286 (proof in filiation proceeding); Johnson v. Feskens, 1934, 146 Or. 657, 31 P.2d 667, 107 A.L.R. 340 (proof to justify forfeiture under a contract); Dickson v. St. Louis and K. R. Co., 1902, 168 Mo. 90, 67 S.W. 642 (to divest title to real estate for breach of a condition subsequent.) Likewise as to claims evidenced merely by the oral testimony of interested witnesses as to events long past. E. g. 57 Am.Jur., Wills §§ 981–83 (1948) (to prove a lost will); 57 Am. Jur., Wills § 728 (1948); Note, 1930, 69 A.L.R. 167 (to prove agreement to leave property to another); Note, 1949, 7 A.L.R.2d 25 (proof of agreement for compensation for services rendered to a relative); 24 Am.Jur., Gifts § 133 (1933) (to prove a parol gift after the death of the donor); 54 Am.Jur., Trusts §§ 620–24 (1945); 1923, 23 A.L.R. 1500 (oral proof of an express trust in realty or personalty, or of facts giving rise to a resulting or constructive trust); Furman v. St. Louis Union Trust Co., 1936, 338 Mo. 884, 92 S.W.2d 726 (agreement to adopt as basis for sustaining right to inheritance); The Barbed Wire Patent, Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co., 1892, 143 U.S. 275, at page 284, 12 S.Ct. 443, 36 L.Ed. 154 (to prove prior anticipatory use of an invention); Commissioner, etc., v. Ryan, 1933, 238 App.Div. 607, 265 N.Y.S. 286 (proof in filiation proceedings.)

6. Bridges v. United States, 346 U.S. 209, 73 S.Ct. 1055, 97 L.Ed. 1557.

7. Schneiderman v. United States, supra; Baumgartner v. United States, supra.

facts directly relating to party membership, three were former Communists and it is not certain as to the present status of two of these.

The testimony of the "former" Communists was tinged and colored with discrepancies, animosities, vituperations, hates and above all, with lengthy speeches and declarations of viewpoints, which, it is not unfair to say, is a disease with which Communists are afflicted. Respondent, himself, was not a good witness; he was perhaps the most voluble of all; he made misstatements and was at times evasive. His denial of party membership and avowal of loyalty to the United States were, however, articulate and emphatic. To sift the truth from this welter of words of these witnesses is a task for the omniscient. But we need not aspire to such high competence, if the result does not appear clearly and persuasively. Even the diligence and exceptional ability of government counsel cannot make clear and convincing that which lacks these essential qualities.

The witness Schomaker testified as to a number of so-called "party meetings" which, he said, Bridges attended and in which he participated. Other ex-Communists testified as to some of these "meetings," their nature and purpose. Leaving aside discrepancies as to time, purpose and parties present, there does not clearly or convincingly emerge a picture of action at these "meetings" relating to ultimate Communist objectives, unrelated to purely trade-union activities, at least to the extent of warranting the inference of membership from Bridges' attendance. Indeed, most of the matters discussed seemed to correspond closely with legitimate union activities. No witness testified to the conduct exclusively of any purely Communist business at these meetings, solely related to ultimate Communist objectives. Not a single witness testified to any act of Bridges that concerned anything except activity that promoted the interest of his union.

The government contended that there was evidence that Bridges, after attending Communist "meetings," changed his views on labor union policies and thereafter followed Communist Party decisions. But the "evidence" referred to, concerned two or three meetings and was most vague and indeed speculative and conjectural and without probative weight.

The so-called "meetings" in the whole ten year period, 1933–1943, were so few and sporadic that extreme caution must be exercised in attempting to draw the inference of Party membership therefrom.

Standing alone, the circumstantial evidence as to these so-called "meetings" does not meet the required standards.

But it is claimed that five other incidents or occurrences warrant the giving of persuasive weight to such testimony:

One, the incidents of the alleged recruitment of Bridges into the party, consisting of two meetings at which Bridges was unsuccessfully solicited, followed by a meeting in 1933 (22 years ago) between the witnesses Schomaker and Jones and respondent when Bridges is alleged to have signed a party membership application, followed by four so-called indoctrination meetings to teach Bridges the principles of the Party

Two, Bridges' alleged election to the Central Committee of the Communist Party, June 1936, in New York City.

Three, testimony of Saunders that he collected party dues from Bridges.

Four, a meeting at the Shaw home in 1938 (17 years ago) where, it is alleged, Bridges announced his party membership in a mixed meeting of Communists and nonCommunists and urged the latter to join the Party.

Five, Bridges' alleged attempt to recruit Hook into the Party.

As to (1), Jones and Bridges controvert Schomaker. There are grave improbabilities in Schomaker's story. It is not at all convincing. In the broad view of him as a witness, his testimony lacks the weight necessary to meet the required standard. (See Appendix B.)

As to (2) this incident has no probative value. (See Appendix C.)

As to (3), Saunders' testimony is inherently flimsy; it has discrepancies. It is unacceptable. (See Appendix D.)

■■ As to (4), Schomaker's testimony is unacceptable. Mrs. Harris' testimony in the criminal trial, admitted here because of her intervening death, under the common-law rule and § 1870 (8) of the California Code of Civil Procedure, is without convincing force. Testimony as to oral admissions in criminal cases is received with caution. It is traditional to so instruct Federal juries. All the more so here, where there was no opportunity for personal observation of the witness. (See Appendix E.)

As to (5), Hook's testimony is unsubstantial and completely fails to sustain the claim made for it. (See Appendix F.)

The Appendices above-specified are appended, by way of illustration only, to point up some, but, by no means all, of the weaknesses of the testimony and are irrespective of the general unclearness and unacceptability of the evidence, as already pointed out.

The testimony of witnesses Jones, Mann and Melin, former Communists, who gave evidence on behalf of respondent, was also replete with inconsistencies, hates and malice. It is likewise not worthy of belief. But the inherent infirmity of the government's case lies in its own evidence and does not manifest itself out of any conflict between the opposing witnesses.

We are left, then, with an evidentiary picture in which infirmity as to the "meetings" testimony is merely added to infirmity as to specific occurrences. Firmity as to one type of evidence might produce a degree of clarity and persuasiveness. Not being present in either type of testimony, the result is not adequate to meet the standard.

To cancel respondent's citizenship, after ten years of presumptively good and proper citizenship, the government had to meet an "exacting standard."[8] It did not meet this standard by the kind of witnesses it produced. Particularly is this so, after abortive efforts to prove the same issue in different proceedings and after the passage of many years.

The words of Mr. Justice Frankfurter in Baumgartner v. United States, supra [322 U.S. 665, 675, 64 S.Ct. 1245], are appropriate:

"But relaxation in the vigor appropriate for scrutinizing the intensity of the allegiance to this country embraced by an applicant before admitting him to citizenship is not to be corrected by meagre standards for disproving such allegiance retrospectively. New relations and new interests flow, once citizenship has been granted. All that should not be undone unless the proof is compelling that that which was granted was obtained in defiance of Congressional authority. * * * But where the claim of 'illegality' really involves issues of belief or fraud, proof is treacherous and objective judgment, even by the most disciplined minds, precarious. That is why denaturalization on this score calls for weighty proof, especially when the proof of a false or fraudulent oath rests predominantly not upon contemporaneous evidence but is established by later expressions of opinion argumentatively projected, and often through the distorting and self-deluding medium of memory, to an earlier year when qualifications for citizenship were claimed, tested and adjudicated."

Only a weak yielding to extra-judicial clamor would excuse acceptance of the testimony of the witnesses in this case as proof of the allegations of the complaint.

■ My conclusion is that the Government has failed to prove the allegations of its complaint as to respondent's alleged membership in the Communist Party by clear and convincing evidence.

The Court is separately filing herewith its Findings of Fact and Conclusions of Law.

Counsel will present, after notice, a decree in favor of respondent.

8. Schneiderman v. United States, supra, 320 U.S. at page 125, 63 S.Ct. at page 1337.

Appendix A

| | |
|---|---|
| 1921 | Bridges files first papers for naturalization. |
| 1928 | Application for final papers made and denied on the ground that the 7-year period for filing had elapsed. |
| 1928 | Bridges again files first papers. (7-year period again elapses) |
| 1936 | Bridges again files first papers. |
| 1938 | Deportation warrant issued. |
| March 28, 1939 | Declaration of Intention filed. |
| July, August, Sept., 1939 | Hearing before Dean James M. Landis; decision in favor of Bridges. |
| January, 1940 | Secretary of Labor sustains Landis, and dismisses proceedings. |
| June 28, 1940 | Deportation statute amended. |
| February 14, 1941 | Second deportation warrant issued. |
| March 31, 1941 to June 12, 1941 | Hearing before Judge Charles B. Sears who finds against Bridges. |
| January 3, 1942 | Board of Immigration Appeals disapproves Judge Sears findings and cancels warrant. |
| May 28, 1942 | Attorney General Francis Biddle adopts Sears' Findings and Conclusions and orders deportation of Bridges. |
| February 8, 1943 | Judge Welsh denies petition for habeas corpus, Ex Parte Bridges, D.C., 49 F.Supp. 292. |
| June 26, 1944 | Court of Appeals affirms Judge Welsh, Bridges v. Wixon, 9 Cir., 144 F.2d 927 rehearing denied, September 27, 1944. |
| June 18, 1945 | Supreme Court reverses Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103. |
| June 23, 1945 | Bridges files preliminary form for petition for naturalization. |
| August 8, 1945 | Bridges testifies at hearing before naturalization examiner. |
| September 17, 1945 | Bridges appears in Superior Court for naturalization and is admitted. |
| May 25, 1949 | Indictment returned against Bridges, Schmidt and Robertson, and denaturalization proceedings filed. |
| Oct. 12, 1949 | Judge Harris denies motion to dismiss indictment, and stays denaturalization proceeding. D.C., 86 F.Supp. 922 and 931. |
| April 4, 1950 | Bridges, Schmidt, and Robertson convicted by jury. |
| April 10, 1950 | Judgment and sentence. |
| June 16, 1950 | Judge Harris revokes Bridges' naturalization. |
| September 6, 1952 | Court of Appeals affirms judgment of conviction, 9 Cir., 199 F.2d 811, and judgment of denaturalization, 9 Cir., 199 F.2d 845, rehearing denied November 18, 1952, rehearing en banc denied, December 29, 1952, 9 Cir., 201 F.2d 254. |
| June 15, 1953 | Supreme Court reverses, 345 U.S. 979, 73 S.Ct. 1130, 97 L.Ed. 1393, June 15, 1953 (judgment of denaturalization); 346 U.S. 209, 73 S.Ct. 1055, 97 L.Ed. 1557, June 15, 1953 (judgment of conviction). |

## Appendix B

### Bridges' Recruitment, Attendance At Unit Meetings, And Payment Of Dues. (Schomaker's testimony.)

Schomaker testified that he had been active in the Communist Party in San Mateo County for some two years when he moved to San Francisco in late October, 1933. He reported at once to Sam Darcy, the District Organizer of the Communist Party, and was assigned to the San Francisco Longshore Unit. This Longshore Unit was headed by one Herman Mann, as Unit Organizer. It had less than ten members—five longshoremen, including Schomaker, and several unemployed seamen.

Almost immediately, Schomaker came into contact with Harry Bridges. Bridges, at this time had already begun his rise to prominence as a longshore leader. He had been elected the preceding September to. the executive board of the recently reorganized local of the International Longshoremen's Association. He had taken a leading part in a strike in early October which had strengthened the position of the new union. He was also, at this time, according to Schomaker, a member of a small group who were publishing, in a rather haphazard manner, a mimeographed newspaper known as the Waterfront Worker.

The majority of the group who were publishing the Waterfront Worker, Schomaker asserted, were members of the Communist Party, and he became associated in this endeavor. It was as a member of this group that he first met Bridges. Almost coincidently in time, he testified, it was determined at a meeting between him, and Darcy and Mann that Bridges should be recruited into the Party. This decision was prompted by the desire to add to their membership someone who was well-known on the waterfront and who could speak well. As a result of this decision, efforts were made at meetings of the Waterfront Worker group throughout November to interest Bridges in the program of the Communist Party. These initial efforts were followed by two meetings in December at which Darcy and other party members directly sought to recruit. Bridges. Bridges was initially disinterested, Schomaker testified, but eventually became·convinced that the Communist Party was really getting places because of the "marvelous results" of its pro-gram. However, Bridges did not join the party at either of these two meetings.

Thereafter, sometime toward the end of December or the first of January, Schomaker came across one B. B. Jones on the Embarcadero. B. B. Jones was one of the unemployed seamen attached to the Longshore Unit. Schomaker and Jones. stopped at a restaurant on lower Market St. where, by chance, they met Bridges. They joined him for coffee, and Jones produced a blank application for membership in the Communist Party and sought to interest Bridges in joining. During the course of the discussion, Schomaker left to talk with some unidentified person who passed by the restaurant. As Schomaker was reentering the restaurant some 10 or 15 minutes later, he met Jones on his way out. Jones showed him the application card with Bridges' signature. They, at once, went to the office of Sam Darcy, where Jones and Schomaker signed the application as sponsors.

Beginning the following Thursday, Schomaker testified, Bridges attended a series of four .indoctrinational meetings. These were not the new-member classes which recruits ordinarily attended, but the regular Thursday night meetings of the Longshore Unit. Certain party members who were not attached to the Unit appeared at these particular meetings to speak on the organization and program of the Communist Party especially for the benefit of Bridges. Schomaker described these meetings in great detail as to their location, the persons present, and the matters discussed by the featured speaker. At the first of these meetings, Schomaker testified, he delivered Bridges his party book for the year 1934.

Schomaker's description of Bridges' recruitment as a party member in 1933 is not convincing. At that time, the Longshore Unit of the Communist Party had but a handful of members, and apparently little or no financial assets. Bridges had already been elected as a member of the executive board of the I. L. A., and was pursuing a program of his own. Yet, according to Schomaker, within a few weeks, Bridges' initial disinterest in the Communist Party program was overcome. Schomaker attributed this change in attitude, in major part at least, to the "marvelous results" shown by the Communist Party program. But, the only program he described was one merely proposing a code of working conditions, wages, and hours, such as was generally sought by the longshoremen at the time. He did not testify to anything which might properly be termed "results", let alone "marvelous results."

The testimony concerning the occasion on which Jones secured Bridges' application for membership is not persuasive. Jones was characterized by Schomaker as one of the unemployed seamen attached to the Longshore Unit who were assigned the relatively minor roll of couriers for the Waterfront Worker. He was not placed by Schomaker at any of the meetings at which attempts had been made to recruit Bridges. Yet, on this occasion, it was Jones who supposedly brought up the subject of Bridges' membership and then secured his application, while Schomaker was conversing with some unidentified person outside the restaurant.

The testimony concerning the indoctrinational meetings following Bridges' recruitment is most incredible. Schomaker testified that Bridges was instructed at the regular weekly meetings of the Longshore Unit so that he would not be exposed to the risk of attending the customary new-member classes. These regular meetings, Schomaker said, were not held at an established meeting place but at the homes of the Unit members. Yet, although he was speaking of a period in time some 20 years past, he professed to recall precisely which home was the site of each of these meetings, and, when asked concerning one of them, the particular members of the Unit who were present that night. Moreover, he summarized with considerable detail the words of the featured speaker on each occasion.

The preciseness and completeness of Schomaker's testimony concerning the recruitment and indoctrination of Bridges is strikingly incongruous with the generality of his testimony concerning the years immediately following. He stated that he delivered new party books to Bridges at the beginning of 1935 and 1936. He said that Bridges attended Unit meetings during these years and that he observed him pay party dues. He classified Bridges as a good party member despite his delinquence in paying dues. But he did not describe any specific Communist meeting which Bridges attended, after he supposedly joined the party at the very beginning of 1934, until the fall of 1936, nearly three years thereafter. Schomaker inferred that much Communist activity was going on all the time. He testified that he was an active party member during this period and held important offices. Yet he did not testify concerning any activity which Bridges engaged in on behalf of or in connection with the Communist Party during these years following his recruitment.

### Appendix C

#### The Election To The Communist National Committee.

The witness Saunders testified that in early 1936, while he was Waterfront Organizer of the Communist Party, he attended a party meeting at Redman's Hall in San Francisco. Some 40 to 50 persons were there. During the course of the meeting Bridges spoke and was introduced as "Comrade Rossi." Saunders did not describe the purpose of the meeting except to say that it was in connection with "the developing maritime situation." Although he termed the meeting a very crucial one, he could not recall what was discussed there except

in such general terms as "the West Coast maritime situation, the possibility of a strike, and the East Coast situation in relation to the seamen and the longshoremen."

Following this meeting, Saunders testified, he attended a national convention of the Communist Party in New York City in June, 1936. At this convention, he stated, someone who was not present, but who was identified as Comrade Rossi from California, was nominated and elected to the National Central Committee. When this nomination was made, Saunders stood up and cheered.

The Government argues that from this testimony it can be inferred that Bridges was elected under the name of Rossi to the National Committee of the Communist Party in 1936. That such an inference is completely speculative, is obvious. Moreover, not a single witness testified to any activity of Bridges which might in any way indicate that he ever held such an office in the Communist Party.

### Appendix D

The Payment Of Party Dues To Saunders.

Saunders testified that shortly after he returned from the national convention of the Communist Party in June of 1936 he went to Bridges' office in the Balboa Building, and said to Bridges that the Unit was very sore about him and that he should pay some dues. In response Bridges slapped three silver dollars on his desk.

It is peculiar, to say the least, that Saunders would have collected dues in such a manner from a man, whom, the Government argues, Saunders believed had just been elected to the National Committee of the Communist Party. Particularly is this so, since Saunders was then Waterfront Organizer and it was not part of his duties to collect dues. Moreover, the defense established that Bridges did not have an office in the Balboa Building until 1937. Although an error as to the location of this par-

ticular occurrence would be quite understandable had Saunders frequented Bridges' various offices throughout the years, Saunders testified that this was the only occasion he was in Bridges' office.

All of Saunders' testimony is weakened by the fact that this improbable incident is the only testimony he offered which would directly indicate Bridges' membership in the Communist Party. Saunders was a high Communist official active on the San Francisco waterfront during many of the years it is claimed Bridges was a party member. Yet, Saunders did not testify as to any activity which Bridges carried on in behalf of the Communist Party.

### Appendix E

The Meeting At The Shaw Home.

This meeting was described as a large one of 35 to 50 persons. Schomaker stated that it was a recruitment meeting and that consequently there were present both Communist Party members and prospects for membership. Bridges was characterized as the main speaker of the evening, and was asserted to have stated in the course of his speech that he was a member of the Communist Party and to have urged the nonmembers present to join.

In the fall of 1938 when this meeting is said to have occurred, Bridges' deportation was already being sought by the United States on the ground that he was a member of the Communist Party, and a warrant against him was outstanding. Under these circumstances, it is against all reason to believe that even a person so brash and outspoken as Bridges has demonstrated himself to be would have made the statements attributed to him before such a group of people. Moreover, the mere selection of Bridges as a recruitment speaker would seem to be completely inconsistent with the steps the party leaders had allegedly taken to preserve his anonymity and security as a party member.

648

## Appendix F

### The Recruitment Of Harry Hook.

The story, of what is termed the solicitation of Harry Hook, was developed through the witnesses, Saunders, Schomaker, and Hook. Saunders testified that in the early spring of 1939 he attended a meeting of the Trade Union Unit of the Communist Party at the party's San Francisco headquarters. A machinists' strike was then in progress, and there was a discussion of the possibility of strengthening the Party's control of the strike by recruiting, as members, Harry Hook and Ed Dillon, the two business agents of the Machinists Union. Al Ward, the chairman of the meeting, suggested to Walter Lambert, State Trade Union Director of the Party, that he contact Bridges as the ideal man to do the recruiting.

Schomaker testified that a machinists strike was discussed at a meeting with Walter Lambert, Bill Schneiderman, Elmer Hanoff and Bridges in the early spring of 1939. Schneiderman instructed Bridges to recruit Harry Hook into the Party in order to make him call off the strike. Bridges replied, "That's absolutely right. I will proceed forthwith."

Harry Hook testified that in the early spring of 1939, Bridges, with whom he was in frequent contact at the time, telephoned him and arranged to meet him at Corbett's Grill. Bridges arrived in the company of Elmer Hanoff, a stranger to Hook. Bridges urged Hook to call off the machinists strike and Hook told Bridges in effect that the strike was none of Bridges' concern. During the course of the conversation Bridges inquired whether Hook had ever considered joining the Communist Party. Hook replied that he wasn't considering it— that he only belonged to two organizations, the Machinists Union and the Masonic fraternity, and that was all he was interested in at the time. No other mention was made of the subject.

The testimony of these three witnesses is a completely unconvincing story. If the Communist Party had determined it was important that Harry Hook be recruited and Bridges, as Party member, had been specifically assigned that job, it is wholly unreasonable to suppose that he would have been deterred from his purpose merely by Hook's expression of disinterest in joining the Party because he already belonged to two other organizations. The testimony of Saunders and Schomaker is also improbable, because in the spring of 1939 Bridges' deportation hearing was still pending. This being so, it is inconceivable that the Communist Party would have selected Bridges as the ideal man to recruit Harry Hook, particularly without any consideration of the risks involved.